No. 77,638

THE BOARD OF COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS, *Appellee*, v. THE CITY OF OLATHE, KANSAS, A Municipal Corporation, *Appellant*, and THE MILTON R. BROWN, MAYNARD H. BROWN, and RUTH H. BROWN TRUST, *Intervenor-Appellant*.

(952 P.2d 1302)

Opinion filed January 23, 1998.

*Thomas A. Glinstra*, city attorney, argued the cause, and *Valerie G. Krueger*, assistant city attorney, was with him on the brief for appellant.

*Michael P. Howe*, of Lewis, Rice & Fingersh, L.C., of Kansas City, Missouri, argued the cause, and Louis A. Cohn, of the same firm, was with him on the brief for intervenor-appellant.

*Richard J. Lind*, deputy county counselor, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a zoning appeal case. The trial court reversed the City of Olathe's decision to rezone the property in question from "AG" (agricultural) to "R-1" (single-family residential). This appeal followed.

The Milton R. Brown, Maynard H. Brown, and Ruth H. Brown Trust (Trust) owns approximately 94.31 acres of land on the southeast corner of 143rd Street and Pflumm Road located in the City of Olathe, Johnson County, Kansas. The land lies north of the Johnson County Executive Airport. If one pictures the half section of land a half mile east and west and 1 mile north and south, the trust property lies in the west half of the northwest quarter and in the northwest quarter of the southwest quarter. The land is adjacent to a strip 500 feet wide that runs to the north line of the northwest quarter. That 500-foot wide corridor is referred to as the critical flight corridor. The Johnson County Executive Airport owns or controls substantially all of the property described above which lies south of the Trust property. All of this property is zoned for agricultural use.

Andrew J. Schlagel, agent for the Trust, filed an application for rezoning with the City of Olathe (City). The application requested that zoning of the Trust property be changed from "AG" (agricultural) to "R-1" (single-family residential). A public hearing before the Olathe City Planning Commission (City Planning Commission) was set.

Prior to this hearing, the Trust submitted a concept plan to the City Planning Commission. The City planning staff sent a request for review of the proposed rezoning to the Johnson County planning staff, the Overland Park Department of Planning and Research, and the Johnson County Airport Commission (Airport Commission).

The Airport Commission responded in writing, detailing several objections concerning the Trust property's location in relation to the Johnson County Executive Airport. The Airport Commission listed the following concerns: (1) The property has a common boundary with airport property to the south; (2) the north threshold of the airport runway is 1,900 feet south of the southern boundary of the Trust property; (3) high-intensity strobe lights, *i.e.*, airport approach lights, are positioned between the Trust property and the airport, starting at 1,100 feet from the southeast corner of the Trust property and running toward the centerline of the airport runway; (4) the Trust property lies under the aircraft traffic pattern for the airport, with the final direct approach for most aircraft being directly over the Trust property; (5) the Trust property lies within an area with a relatively high statistical probability of an aircraft accident, with the last major accident possibly occurring within the tree line along the eastern boundary of the Trust property; and (6) the southeastern portion of the Trust property lies within a relatively high noise area for the airport (60 Ldn), although below the FAA's "no residential" threshold (65 Ldn).

The Airport Commission summarized its concerns by indicating that the Executive Airport handles as many as 700 flights per day on a nice summer weekend and over 110,000 flights per year. The Airport Commission indicated that Johnson County had adopted special land use plans and regulations concerning development around the county's two airports, with these same plans and regulations proposed to be adopted by the City of Olathe. The Airport Commission urged denial of the rezoning request.

In a follow-up memorandum, written after the Airport Commission reviewed the City planning staff's report, the Airport Commission indicated that while the apparent use of the property to the south of the Trust property is agricultural, the primary use of that airport-owned property is for the FAA-required runway protection zone, which is required to prevent uses of land that conflict with landings and take-offs at the airport. The Airport Commission also requested that if rezoning is approved, there should be plat and deed notations indicating that the developed property is ad-

jacent to the Executive Airport, underlies the airport traffic pattern, and will be subject to a high frequency of low-flying aircraft.

The Johnson County Office of Planning (County Planning Office) also responded in writing. The County Planning Office noted that the area in question was within the Airport Interest Area of the Johnson County Executive Airport Comprehensive Compatibility Plan prepared by a study group that focused on land use and development compatibility considerations for areas near the county's two airports. The County Planning Office indicated that these plans and regulations had been proposed for adoption by each of the three cities nearest the airports, including the City of Olathe, and by the County. "The intention is joint adoption and administration of land use and development decisions in the airport area instead of unilateral planning and zoning control of a 1-mile wide area around the airports." Further, the County Planning Office indicated that

"[t]he City of Olathe has 'approved' the airport area plans but the approval action has not been published, so the adoption process is incomplete. It is our understanding that publication of the airport area plan approval is being withheld until the city has also approved the airport area zoning and subdivision regulations."

According to the County Planning Commission, the County-adopted plans proposed the following for the site on which the Trust property is located:

"• Residential uses on lots not smaller than 2 acres.
"• The east edge of the site (about 80 feet wide) would be in the Primary Flight Corridor for the north end of the Executive Airport runway and would be subject to the special land use controls for the flight corridor areas.
"• A triangular-shaped area of about 8.5 acres at the southeast corner of this 91 acres is within the 60 Ldn sound level contour of the airport. It would be an area where special noise attenuation construction measures would be required to help reduce noise levels. . . .
"• Affidavits of Interest would need to be filed if the plan and regulations had been adopted by the City of Olathe."

The County Planning Commission urged consideration of the Johnson County Executive Airport Comprehensive Compatibility Plan during the review of the Trust's rezoning request.

Finally, the City of Overland Park responded with some suggestions concerning street and cul-de-sac locations and setbacks, indicating a need for a street connection between the proposed project and any residential development on the tract to the east, if there were to be such in the future.

The City planning staff report included discussions on the Trust property's physical characteristics, the surrounding land use/zoning, the character of the area, the City's *"Comprehensive Plan,"* the Johnson County Executive Airport concerns, the Johnson County and City of Overland Park planning staff comments, the compatibility of the proposed rezoning with the Draft Comprehensive Compatibility Plan for the Executive Airport, sewer and water availability, streets and right-of-way needs and conditions, and the submitted sketch plan. The City planning staff recommended denial of the requested rezoning, citing the following:

"(1) The density allowed under the requested R-1 zoning would exceed the rural residential designation of the *Comprehensive Plan.*

"(2) The requested R-1 zoning would not be compatible with the developed and developing rural residential character of this section of land.

"(3) Although this property has been vacant for several years, there has not been any attempt to develop it with rural residential lots.

"(4) The low-density residential development (shown 3.0 units per acre—allowed 4.5 units per acre) is inconsistent with the proposed Johnson County Executive Airport Comprehensive Compatibility Plans which designate this site as appropriate for airport rural residential on 2 acre minimum lots.

"(5) The inadequate design of Pflumm Road, from 143rd to 151st Streets, to handle the anticipated volumes of residential traffic."

If the R-1 zoning was approved, the City planning staff recommended the zoning be approved with the following stipulations:

"(1) The subject tract shall be platted prior to development.

"(2) The additional right-of-way required for 143rd Street and Pflumm Road shall be dedicated prior to the publication of the ordinance establishing the requested R-1 zoning designation.

"(3) As a minimum improvement Pflumm Road shall be constructed with a three (3) inch asphalt overlay from 143rd Street to 151st Street prior to a certificate of occupancy for any lot within the subdivision.

"(4) Compliance with all Johnson County Executive Airport residential development design guidelines as approved by Johnson County and the city of Olathe.

"(5) The subject tract shall have plat and deed notations that the property is adjacent to the Executive Airport, underlies the traffic pattern for the airport, and will be subject to a high frequency of over flights by aircraft at low altitudes.

"(6) The subject tract shall be limited to a maximum of three (3.0) units per net acre."

After discussion, including comments from Lee Metcalf of the Airport Commission and Andy Schlagel for the Trust, the City Planning Commission voted unanimously to deny the zoning request, citing the reasons stated in the staff report.

The rezoning application was next considered by the Olathe City Council (City Council). The City Council heard a presentation from the City planning staff and comments from the Trust's agent. The County did not attend or speak at the City Council meeting. The City Council discussed and heard questions and answers concerning the following points on the rezoning application:

(1) No federal guidelines would be violated by the rezoning.

(2) The Airport Commission, via the County's letter, had not established its "credibility" "legally or concretely" and should not be given additional weight.

(3) The City has not adopted the County's comprehensive plan concerning the airport.

(4) Deed notations concerning the location of the airport should be required and included in the stipulations in the ordinance.

(5) Mr. Schlagel would recommend to his clients that disclosure statements be required in addition to deed notations, as the deed restrictions may not be effective for purposes of notification.

(6) Sewer availability for and sewer assessments on the Trust property would be happening in the near future. Surrounding rural residential homes have been developed with septic tanks where the lots are at least 3 acres. A petition to create a sewer district was circulating and extension of the sewer mainline extension should reach the area by the end of 1994. This discussion included the cost of developing the Trust property with sewers as opposed to developing it with septic tanks.

(7) Surrounding roads are inadequate and road assessments and improvements would be a requirement before residential occupancy. Pflumm Road between 143rd Street and 151st Street along the east edge of the Trust property is gravel. Along the north edge of the property, 143rd street has an asphalt overlay which would need improvement.

(8) If the zoning were approved, improvements in the water service to the Trust property would be required and some of it would be completed by the developer.

(9) The economic viability of developing a subdivision with two or three acre lots with sewers under the current zoning was questionable, according to the Trust representatives.

(10) The statistical probability of an aircraft accident on this property was discussed generally. There was some dispute as to whether the last aircraft accident actually happened on the Trust property or whether it happened in the vertical flight corridor.

(11) The strobe lights would only be a problem during fog and inclement weather. The lights, when in use, would be somewhat shielded by a natural rise in the land.

(12) There is a conflict between the City's comprehensive plan and the proposed rezoning. The City's 1988 comprehensive plan has this area slated for rural residential development, *i.e.*, one unit per each 2 or 3 acre lot, while the airport comprehensive plan would propose rural residential lots of a minimum of 2 acres.

(13) The Trust had owned the property for 15 to 20 years before it was annexed by the City. It has operated Hilltop Stables on the property during the time it has been zoned "Agricultural."

(14) The airport traffic pattern is generally over the Trust property because the residents on the east side of the airport complained about the noise. At that time, the airport operator agreed to move the traffic pattern to the west.

The City Council then voted to approve the rezoning, Ordinance No. 94-40, on a vote of 5 to 1. Included in the Ordinance were the following stipulations:

"a. The subject tract shall be platted prior to development.

"b. The additional right-of-way required for 143rd Street and Pflumm Road shall be dedicated prior to the publication of the ordinance establishing the requested R-1 zoning designation.

"c. As a minimum improvement Pflumm Road shall be constructed with a three (3) inch asphalt overlay from 143rd Street to 151st Street prior to a certificate of occupancy for any lot within the subdivision.

"d. Compliance with all Johnson County Executive Airport residential development design guidelines as approved by Johnson County and the city of Olathe.

"e. The subject tract shall have plat and deed notations that the property is adjacent to the Executive Airport, underlies the traffic pattern for the airport, and will be subject to high frequency of over flights by aircraft at low altitudes.

"f. The subject tract shall be limited to [a] maximum of three (3.0) units per net acre."

On July 21, 1994, the Chairman of the Board of Johnson County Commissioners (County) sent a letter to the City Council expressing concern with the rezoning and requesting reconsideration of the rezoning application. The County noted that the City and the

County had been cooperating on an airport area compatibility plan for 5 years and that the Trust property was in a critical location. The County reminded the City of the "Memorandum of Understanding executed in 1991" between the City and the County, as well as with the City of Overland Park and the City of Gardner. The County was acting with the understanding that the Memorandum of Understanding would remain in effect until the formal agreements, plans, and regulations concerning the airport comprehensive plan were adopted by all parties. The County pointed out that the City continued to practice the Memorandum's notification procedures by sending zoning information to the County Planning Commission and the Airport Commission. After quoting specific language from the Memorandum, the County acknowledged that the Memorandum did not give the County "any controlling authority in this zoning case." The County implied that, in the future, it would take action under its statutory authority concerning airport zoning.

The City published Ordinance No. 94-40 in the Olathe Daily News authorizing the rezoning.

The County filed suit, alleging that the City's approval of the rezoning application was arbitrary, capricious, and unreasonable, that the City failed to obtain approval from the County as is required by K.S.A. 3-307e, that the City failed to follow and adhere to the procedure established in the 1991 Memorandum of Understanding, and that the City's action was unlawful and, therefore, null and void.

The Trust was permitted to intervene in the case. The district court bifurcated the case and requested briefing on the issue of reasonableness, with the question of lawfulness to be determined later, if necessary. After briefing by the parties, the district court heard oral arguments on the issue of the reasonableness of the City's rezoning action and issued its decision, with the following findings and conclusions:

"The court finds and determines that the action of the Council of the defendant City in adopting the subject rezoning ordinance was unreasonable, arbitrary and capricious for the reasons stated and authority cited by plaintiff in its memorandum (January 26, 1996) and in its reply (February 16, 1996), and, in doing so,

specifically adopts the conclusions stated in plaintiff's reply (February 16, 1996) at pages 20-22, including the reason stated in paragraph 8 on page 22."

While the reasons stated and authority cited by the County in its January 26 memorandum and February 16 reply and incorporated by the district court are too lengthy to include in this opinion, the County's conclusions in the February 16 reply follow:

"The action taken by the Defendant City in approving the rezoning of the Intervenors' property is unreasonable because:

"1. The record does not contain substantial, competent evidence to support the decision to approve the rezoning; it does to deny the rezoning.

"2. The zoning and uses of nearby property (the existing Johnson County Executive Airport) are not compatible with the proposed use of the property for high density residential development.

"3. Due to the proximity of the subject real property to the existing airport, and the dangers associated with potential aircraft crashes, the subject property is not suitable for high density residential development.

"4. Removal of the zoning restrictions upon the subject real property shall cause the property to become an incompatible land use with the existing airport, which in and of itself has a detrimental affect.

"5. The Intervenors have not provided any substantial, competent evidence that they shall be left without any economical [sic] viable uses of the property if they are not provided with R-1 district zoning. All they have attempted to illustrate is a potential loss of profit margin or increased cost of development.

"6. Without proof of denial of all economical [sic] viable uses of their property, the relative gain to the public health, safety and welfare by denial of the rezoning outweighs unproven hardship imposed upon the Intervenor/landowners. High density residential development near an airport is not prudent planning. Furthermore, the Intervenors may have other economical [sic] viable uses available for their property, which would not be incompatible with an existing airport.

"7. The recommendation of the City Planning Department and the City Planning Commission, which was supported by findings and conclusions, was for denial of the rezoning.

"8. The City Council voted to approve the rezoning without providing any reasons in support thereof.

"9. The decision to approve the rezoning is in conflict with the City's Comprehensive Plan and the County's Compatibility Plans for permitted land uses upon the subject real property.

"10. Based upon the facts provided to the City Council, the substantial, competent evidence on the record requires [sic] that the action taken by the Defendant City was unreasonable.

"11. The preponderance of the evidence supports the claims of the Plaintiff Board that the actions taken by the Defendant City were unreasonable."

The City and the Trust appealed.

The case was transferred from the Court of Appeals upon order of the Supreme Court pursuant to K.S.A. 20-3018(c).

K.S.A. 12-760(a), concerning zoning decisions, provides in part:

"Within 30 days of the final decision of the city or county, any person aggrieved thereby may maintain an action in the district court of the county to determine the reasonableness of such final decision."

The scope of review in zoning cases is governed by a series of concepts summarized in *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980):

"(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.

"(2) The district court's power is limited to determining
(a) the lawfulness of the action taken, and
(b) the reasonableness of such action.

"(3) There is a presumption that the zoning authority acted reasonably.

"(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

"(5) A court may not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

"(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate.

"(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

"(8) An appellate court must make the same review of the zoning authority's action as did the district court."

These *Combined Investment Co.* concepts serve as a backdrop against which the factors considered by the City in reaching its decision are to be viewed. See *Davis v. City of Leavenworth*, 247 Kan. 486, 493, 802 P.2d 494 (1990).

In *Golden v. City of Overland Park*, 224 Kan. 591, 597, 584 P.2d 130 (1978), we observed:

"A mere yes or no vote upon a motion to grant or deny leaves a reviewing court, be it trial or appellate, in a quandary as to why or on what basis the board took its action. A board, council or commission, in denying or granting a specific zoning change, should enter a written order, summarizing the evidence before it and stating the factors which it considered in arriving at its determination."

In *Davis*, we commented: "Our observation [in *Golden*] continues to have merit. We commend it to any board, council, or commission denying or granting a specific zoning change." 247 Kan. at 493.

*Golden* enumerated eight factors which a zoning body should consider:

(1) the character of the neighborhood;

(2) the zoning uses of nearby properties;

(3) the suitability of the property for the uses to which it is restricted;

(4) the extent to which the change will detrimentally affect nearby property;

(5) the length of time the property has been vacant as zoned;

(6) the gain to the public health, safety, and welfare by the possible diminution in value of the developer's property as compared to the hardship imposed on the individual landowners;

(7) the recommendations of a permanent or professional planning staff; and

(8) the conformance of the requested change to the city's master or comprehensive plan. 224 Kan. at 598.

These are suggested factors only. Other factors may be important in an individual case. 224 Kan. at 599.

Appellant City argues that since *Golden* was decided this court has softened its stand, holding that written orders from zoning bodies are not mandatory as long as the record is adequate for a determination of reasonableness. City cites *Davis*, 247 Kan. 486, and *Landau v. City Council of Overland Park*, 244 Kan. 257, 767 P.2d 1290 (1989).

The City argues that *Davis* and *Landau* support a finding that the record before this court and the district court is adequate for a review of the reasonableness question. City contends that the

following information was before the City, is contained in the record, and is adequate for such a determination: (1) the City planning staff report prepared prior to the public hearing; (2) the City Planning Commission's public hearing proceedings, including the staff report, the presentation by the city planner, and the testimony of representatives of the Trust and the Airport Commission, all transcribed; (3) the transcribed minutes of the City Council meeting, showing that the City Council's discussion focused on the main issues; and (4) the audio tapes and video tapes of both the City Planning Commission hearing and the City Council meeting, available to the district court for review if necessary. Based on the availability of these items in the record, the City concludes that the district court erred in finding the record inadequate for review.

We agree with the City that formal findings and conclusions from the zoning authority are not mandatory. See *Davis*, 247 Kan. 486; *Landau*, 244 Kan. 257. In *Landau*, the zoning authority, the City Council of Overland Park, denied a rezoning request. In the process of reaching this decision, the city council heard testimony from the landowner requesting the rezoning, considered a report from the city planning commission, and heard testimony from an interested citizens' group. The city council voted to deny the rezoning request, giving four reasons. These reasons did not comprehensively address the *Golden* factors. On appeal, this court noted that "[a]lthough the City Council would have presented a more sophisticated land use record for review had it specifically addressed the eight *Golden* factors in its decision-making process, we clearly characterized those factors as 'suggestions.'" 244 Kan. at 263. On appeal, this court reviewed the same record as was before the city council and the trial court and found the record sufficient for review. "We are not persuaded that the City's decision was unreasonable merely because *Golden*'s eight factors were not either more specifically enumerated or subjected to an issue-oriented analysis." 244 Kan. at 263.

In *Davis*, we revisited the question of whether a zoning authority was required to specifically enumerate the *Golden* factors when it made its zoning decision. The facts and issues raised in *Davis* were very similar to those before the court here. There, we examined

two issues: (1) whether the record was adequate for a determination of reasonableness; and (2) if so, whether the zoning authority acted reasonably in approving the rezoning request. 247 Kan. at 487. In addressing the adequacy of the record, the city argued, as does appellant City here, that the factors the city considered were apparent in the minutes and transcripts. After examining the discussion as shown by the city council minutes and the additional information presented to the city, this court agreed. 247 Kan. at 492. Although we emphasized the importance of using the *Golden* factors as a guide, we reiterated the *Landau* holding:

"In *Landau* we held the *Golden* factors are merely guidelines or suggested factors (Syl. ¶ 1); a City's decision will not be found unreasonable merely because the *Golden* factors were not specifically enumerated or subjected to an issue-oriented analysis (Syl. ¶ 2); and elected officials are closer to the electorate than the courts and, consequently, are more reflective of the community's perception of its image (Syl. ¶ 4). 244 Kan. 257." 247 Kan. at 496.

The major difference between *Davis* and the instant case is that the City Council here did not give any specific reasons for its decision. This appears to be what the district court was concerned about, and it emphasized this point in its memorandum decision. However, it should be noted that the City Council did not have "[a] mere yes or no vote upon a motion to grant or deny" (*Golden*, 224 Kan. at 597), thereby leaving the reviewing court in a quandary as to why or on what basis the rezoning was approved. There was considerable discussion at the City Council meeting before the vote was taken.

Under *Davis* and *Landau*, the City Council's failure to enumerate reasons for its decision is not fatal to a review for reasonableness, and it was not for the district court herein. The testimony and discussions included in both the City Planning Commission minutes and the City Council minutes, as well as the reports and documents included in the record on appeal, provide sufficient information to review for reasonableness. While the district court was concerned about the lack of formal findings from the City Council, it also adopted additional conclusions from the County's trial briefs that did analyze the reasonableness question. In fact, by

all indications the district court reviewed the record before it, reaching the conclusion that the City's rezoning was unreasonable.

Based on the record before us, we must review it and determine whether the district court properly found the City's decision to grant the Trust's rezoning request was unreasonable. The Trust describes the Trust property as having a "developing residential character" and as "ready to be developed." Additionally, the surrounding area is characterized as having some low-density single-family residential zoning to the west already in place. The Trust asserts that the property to the north is zoned R-1. Finally, the Trust concludes that the property itself, rolling slopes with no significant vegetation, is ideally suited for residential development.

The City acknowledges that at the time of the rezoning decision, the character of the area was rural residential with a mixture of agricultural uses, large lot residential subdivisions, and typical sub-urban homesteads. However, because of the encroaching development from Olathe and the eminent arrival of city sewer services, the character of the neighborhood is changing. With R-1 zoning to the west and R-1 zoning to the north, the area south and east of 143rd and Pflumm Road is also beginning to develop. Because the property to the immediate east of the Trust property is the critical landing and take-off corridor of the airport and will not be developed, the City contends that this will act as a buffer between the rural residential area farther to the east and the approved R-1 rezoning of the Trust property. Finally, the City argues that the arrival of sewer service to the area makes greater residential density more likely and more easily supported. The sewer services can change the character from rural residential density to urban density. Given the changing nature of the area, the City's zoning decision was reasonable on this point.

All three parties' characterizations of the neighborhood are accurate, and the City Council had all of this information before it when it reached its decision to approve the rezoning. While the County focuses on the rural aspect of the neighborhood, looking further to the east and south for support of this vision, the City and the Trust look to the north and west at the approaching residential development.

Given our standard of review and the presumption in favor of the zoning authority, the City's action was not so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large. The City appeared to be well aware of the diversity of development characteristics in this area, in fact, limiting the developer to 3 units per acre rather than the 4.5 units traditionally allowed under an R-1 zoning designation. The City's decision was reasonable on this point.

The City had substantial information before it and considered the possible uses for the Trust property, as well as the changing nature of the surrounding area. The City has the right to change or refuse to change the zoning, and its decision carries the presumption of reasonableness. Although the land appears to be well-suited for agricultural use, it is located in a changing area where residential density is increasing. It is reasonable for the City to plan for the encroaching change in this area. The decision is not so wide of the mark that it lies outside the realm of fair debate.

The City contends that the only evidence in the record of detrimental effect on nearby property is the effect the nearby airport will have on this property. The City Council considered the problems of the strobe lights, the landing corridor, the aircraft flight patterns, and the noise contour. After considering all of these issues, the City concluded that they could be addressed by the developer and by requiring notification to any future owners.

The Trust notes also that the airport operations are what appear to be detrimental, not the zoning change. The Trust points out that the aircraft flight pattern over the Trust property is one purposefully imposed by the Airport Commission to avoid complaints from landowners to the east.

The City Council discussed the airport problems extensively at its meeting. It also had before it the information from the County planning staff and the Airport Commission outlining what they saw as the future problems if this area were to be rezoned. However, given the stipulations included in the zoning ordinance, as passed, the City made an attempt to address these concerns. Additionally, no other property owners, outside of the Airport Commission, ap-

peared or sent letters objecting to the rezoning request. The City's decision was not unreasonable on this basis.

The City argues that the recommendation of denial from the City planning staff and Commission was based upon the fact that the City's comprehensive plan and the airport comprehensive compatibility plan both show the area as rural residential. The professional staff did not have the economic considerations before it. Because of the encroaching development and the future availability of sewers, the City was reasonable in considering the economic impact of its decision on the landowner. The City considered these facts and reasonably decided not to follow the recommendation of its planning staff. Given the changing nature of the area since the adoption of the master plan, the City had the right to change the zoning from that given in the plan.

The reports from the City planning staff and the City Planning Commission are nearly identical and both recommend denial of the rezoning request. However, both reports also include suggested stipulations for consideration should the City Council decide to grant the rezoning. These recommended stipulations are, in fact, the exact stipulations included in the final zoning Ordinance passed by the City Council and published in the newspaper. The City did not completely ignore the recommendation of its planning staff. In fact, the City implemented the suggested alternative recommendations. This was not unreasonable or arbitrary.

The City's comprehensive plan and the airport compatibility plan are not a part of the record. However, it is uncontroverted that these planning documents recommended rural residential development for this area. Rural residential zoning would allow for lower-density larger-lot residential development. The City Council was aware of the conflict between the comprehensive plan and the requested rezoning, as well as the conflict between the airport compatibility plan and the rezoning. Much of the discussion reported in the minutes of both the City Planning Commission and the City Council revolved around the issue of the appropriate density of the proposed residential development. Again, if one looks to the north and west of the Trust property, development is more dense than if one were to look to the south and east of the Trust

property. The perspective of the City was toward the more dense, encroaching development.

Formulation of comprehensive plans are provided for statutorily. K.S.A. 12-741 *et seq.* addresses planning, zoning and subdivision regulations in cities and counties. Cities may create planning commissions, as well as adopt and amend comprehensive plans. While certain procedures need to be followed when changing comprehensive plans once adopted, cities may amend these plans as they see fit. See, *e.g.*, K.S.A. 12-747 and K.S.A. 12-749. Whether the city has followed the appropriate statutory procedures falls within the purview of the question of the lawfulness of the rezoning action. As noted above, however, the issue regarding the lawfulness of the rezoning remains unresolved in this case.

Nonetheless, what is clear by this statutory scheme and by our case law is that a city may amend its comprehensive plan. However, in *Golden*, 224 Kan. at 598, and later, in *Taco Bell v. City of Mission*, 234 Kan 879, 894, 678 P.2d 133 (1984), we urged zoning authorities to examine either the "adopted or recognized" master plan during the rezoning decision-making process. While we recognized that cities are not bound by their comprehensive plans in making these rezoning decisions, we urged that the plans not be overlooked when changes in zoning are under consideration.

The question therefore becomes, after an examination of the entire record, does this seeming disregard for both the City's officially adopted comprehensive plan and the airport compatibility plan tip the scales toward a finding of unreasonableness on the part of the City? Given the information before the City Council and the adoption of the stipulations suggested by the City Planning Commission, the City's decision to grant the Trust's request for rezoning was not unreasonable. Again, there is a presumption that the zoning authority acted reasonably. The zoning authority, not the court, has the right to prescribe, change, or refuse to change zoning. A court may not substitute its judgment for that of the administrative body and should not declare the action unreasonable unless clearly compelled to do so by the evidence. Given this standard of review, the City's disregard for both zoning plans was not unreasonable.

Reversed and remanded for further proceedings on the question of the lawfulness of the City's approval of the rezoning application.