No. 88,075

McPHERSON LANDFILL, INC., *Plaintiff/Appellant*, v. BOARD OF COUNTY COMMISSIONERS OF SHAWNEE COUNTY, *Defendant/Appellee.*

(40 P.3d 522)

■■■■■■■■■■■■■■■■■■■ Opinion filed July 12, 2002. ■■■■■

*Mark Buck*, of Fairchild & Buck, P.A., of Topeka, argued the cause, and *Nathan Burghart*, of the same firm, was with him on the brief for appellant.

*Jonathan C. Brzon*, assistant county counselor, argued the cause, *and Richard V. Eckert*, county counselor, and *Shawn S. Leisinger*, assistant county counselor, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The Shawnee County Board of Commissioners (Board) denied McPherson Landfill, Inc.'s (MLI) application for a conditional use permit (CUP) to establish and operate a construction and demolition (C&D) landfill. MLI petitioned the district court for judicial review. MLI appeals from the district court's summary judgment in favor of the Board. Our jurisdiction is based upon K.S.A. 20-3018(c) by transfer of this case from the Kansas Court of Appeals.

MLI addresses two major concerns in this appeal. The first concern relates to the fairness of the process before the Board and MLI's contention that two of the three members of the Board prejudged its CUP application; the second concern is based upon MLI's contention that the Board's decision to deny the permit was arbitrary and unreasonable. Although MLI raises other concerns which will be addressed in this opinion, the two above contentions are critical to its success before this court.

*Standard of Review*

Before we begin with a discussion of the facts and arguments of the parties, it is helpful to understand how this court reviews and determines the above issues, as well as other issues in this case. In zoning appeals, the standard of review for district courts as well as for this court is set forth in *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980):

"(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.
"(2) The district court's power is limited to determining

(a) the lawfulness of the action taken, and

(b) the reasonableness of such action.

"(3) There is a presumption that the zoning authority acted reasonably.

"(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

"(5) A court may not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

"(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate.

"(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

"(8) An appellate court must make the same review of the zoning authority's action as did the district court."

See *Johnson County Water Dist. No. 1 v. City of Kansas City,* 255 Kan. 183, 184, 871 P.2d 1256 (1994) (applying *Combined Investment* concepts to special use permit decisions); *M.S.W., Inc. v. Marion County Bd. of Zoning Appeals,* 29 Kan. App. 2d 139, 143-46, 24 P.3d 175 (2001) (applying *Combined Investment* concepts to conditional use decisions).

With regard to our review of MLI's first contention involving procedural fairness, this court has decided that where the focus of the zoning authority shifts from the entire city or county to one specific tract of land for which a zoning change is urged, the function of the zoning authority becomes more quasi-judicial in nature than legislative. In such quasi-judicial proceedings, it is incumbent upon the authority to comply with the requirements of due process in its proceedings. Thus, the proceedings must be fair, open, and impartial. A denial of due process renders the resulting decision void. *Suburban Medical Center v. Olathe Community Hosp.,* 226 Kan. 320, 330-32; 597 P.2d 654 (1979); see *Johnson County Water Dist. No. 1,* 255 Kan. at 190-91; *Golden v. City of Overland Park,* 224 Kan. 591, 597, 584 P.2d 130 (1978); *Adams v. Marshall,* 212 Kan. 595, 599-602, 512 P.2d 365 (1973); *Kansas Public Service Co. v. State Corporation Commission,* 199 Kan. 736, 433 P.2d 572 (1967).

Finally, with regard to MLI's second contention that the ultimate decision was unreasonable, this court in *Golden* observed:

"A mere yes or no vote upon a motion to grant or deny [a request for zoning change] leaves a reviewing court, be it trial or appellate, in a quandary as to why or on what basis the board took its action. A board, council or commission, in denying or granting a specific zoning change, should enter a written order, summarizing the evidence before it and stating the factors which it considered in arriving at its determination." 224 Kan. at 597.

As a suggestion to zoning authorities, the *Golden* court enumerated eight factors which address the question of whether a final decision is reasonable. 224 Kan. at 598. The *Golden* factors have become standard considerations throughout Kansas by those charged with the responsibility of voting on zoning changes. However, the following *Golden* factors are suggestions and other factors may be equally or more important factors depending on the circumstances of the particular case:

"(1) The character of the neighborhood;

"(2) the zoning and uses of properties nearby;

"(3) the suitability of the subject property for the uses to which it has been restricted;

"(4) the extent to which removal of the restrictions will detrimentally affect nearby property;

"(5) the length of time the subject property has remained vacant as zoned;

"(6) the gain to the public health, safety, and welfare by the possible diminution in value of the developer's property as compared to the hardship imposed on the individual landowners;

"(7) The recommendations of a permanent or professional planning staff; and

"(8) the conformance of the requested change to the city's master or comprehensive plan." *Board of Johnson County Comm'rs v. City of Olathe*, 263 Kan. 667, 677, 952 P.2d 1302 (1998) (citing *Golden*, 224 Kan. at 598).

The Board based its denial of the requested CUP largely upon consideration of the *Golden* factors. The district court applied the eight principles of review contained in *Combined Investment*, as well as the eight *Golden* factors, in reviewing the Board's decision and in granting summary judgment to the Board. Consistent with the above standard of review, we are called upon to make the same review of the Board's action as did the district court. Applying the above principles, we must decide whether the Board's CUP denial

was consistent with due process and reasonable. We are not free to make findings of fact independent of those found by the Board but are limited to determining whether the given facts could reasonably have been found by the Board to justify its decision. See *Golden*, 224 Kan. at 595-96.

*Facts*

MLI is a wholly owned subsidiary of McPherson Wrecking, Inc (MWI). Virgil McPherson is the president of both MLI and MWI. Scott McPherson is the Vice President of MLI. Unless otherwise noted, Virgil McPherson and Scott McPherson will be collectively referred to as the McPhersons. The McPhersons became interested in property owned and operated as a quarry by Martin Marietta. After an attempted sale of its property to Shawnee County, Martin Marietta, Inc., primarily through Shawnee County contacts, urged the McPhersons to purchase the property for the operation of a C&D landfill.

A C&D landfill is designed to handle solid waste resulting from the construction, remodeling, repair, and demolition of structures, roads, sidewalks, and utilities. A C&D landfill does not accommodate such waste materials as friable asbestos, garbage, furniture, appliances, electrical equipment containing hazardous materials, tires, drums, and containers even though such wastes resulted from construction and demolition activities. See K.S.A. 2001 Supp. 65-3402(u).

*Background information leading to the McPhersons' purchase*

Joe Voth, an employee of Shawnee County who worked in solid waste management, explained the McPhersons' interest and eventual purchase from Martin Marietta. In deposition testimony, Voth said that between 1994 and 1999 there were two potential sites in Shawnee County for a C&D landfill. The first site was at 45th Street and Stubbs Road, which was later sold by the county to Martin Marietta and used as a limestone quarry. The second site and the property at issue in this case was at 29th Street and Ratner Road. According to Voth, this property was similar to a "lunar landscape," and nothing could grow on 75% to 80% of the property.

Voth said old quarries are suitable for landfills because the quarrying operation removes material until "impervious shale or hard limestone" is reached, which creates a "good preparation for the construction of a landfill." Voth, who believed the existing landfills in Shawnee County were becoming full, suggested to the county that the 29th Street and Ratner Road property was a candidate for a landfill. As refuse director for Shawnee County, Voth knew that once other locations were full, C&D waste would have to be taken out of county at a huge expense and deposited elsewhere.

Voth discussed with Bill Gahan, a Martin Marietta representative, a proposal for Shawnee County to purchase the property. Martin Marietta had a conditional use permit to operate a quarry at the 29th Street and Ratner Road property. Its quarry activities at this location dated back to the 1950's. While the active quarrying process discontinued in 1993, Martin Marietta continued to ship large amounts of stone through 1995, and then smaller amounts until 1998.

Voth said that the traffic generated by a C&D landfill would have been less than that generated by Martin Marietta's quarry. According to Voth, no concern was expressed at that time by county officials that there would be any threat to school children or risk of life if the 29th Street and Ratner Road property was used as a C&D landfill.

Martin Marietta offered to sell the property to the county for $850 per acre, but the county rejected that proposal. When Voth realized the county would not purchase the property, he proposed that the McPhersons purchase the property. Voth talked with the McPhersons and introduced them to Martin Marietta representatives. Voth advised the McPhersons that there were no guarantees that the Board would grant a permit to operate a C&D landfill.

Before the purchase of the property from Martin Marietta, Voth scheduled a meeting for the McPhersons to meet with Barry Beagle and John Dugan, who were both employees of the Topeka-Shawnee County Metropolitan Planning Agency (Planning Agency), a joint agency of the City of Topeka and Shawnee County. Neither Beagle nor Dugan expressed any concern that the operation of a C&D landfill would violate the current or any future

zoning plan or disrupt growth patterns. Voth explained why, in his opinion, there was no cause for concern: "[B]ecause the use, current use and the past use of that tract of ground was a quarry and quarry activity is under the same, if I recall correctly, conditional use permit as is a landfill. So, the use would not have been different."

MWI, the parent corporation of the plaintiff, MLI, purchased 678 acres from Martin Marietta at a cost of $850 an acre, less than the original asking price of about three-quarters of a million dollars. Scott McPherson said he believed the C&D landfill would generate $7.2 million over the lifetime of the landfill. Virgil McPherson said in his deposition that he chose the location because of what Martin Marietta said about the land having been used as a quarry. Virgil admitted that there had been no blasting or grinding on the property since 1993.

MWI tried but failed to make the deal with Martin Marietta contingent on its successful zoning application to establish and operate a C&D landfill. Approximately 45 acres were carved out of the 678 acres purchased from Martin Marietta and sold to MLI. MLI paid less than $10,000 for the 45 acres.

It was the McPhersons' opinion at that time that the Planning Agency staff was favorable to the MLI application. However, Scott McPherson did say that no one on the Planning Agency staff promised a favorable recommendation to MLI's application. No one characterized the application as a "done deal." The McPhersons believed the members of the planning staff were very encouraging with respect to the application.

### Application

MLI applied to the Planning Agency on March 6, 2000, for a permit to operate a C&D landfill. Following a conference with the Planning Agency staff, the McPhersons added some documentation to their application, including evidence of necessary permits from various county and state offices. The McPhersons hired an engineering firm to make some "additional erosion drawings, reclamations, depth of indentations and a lot of other studies that had not been initially submitted." The McPhersons estimated the ad-

ditional work cost between $10,000 and $20,000. The McPhersons submitted a revised application on June 9, 2000, including numerous exhibits to support its application. The McPhersons believed there was enough support for the application prior to the July 19, 2000 committee meeting.

*Evidence presented to the Zoning and Platting Committee and the Board*

Tim Paris, a planner for the Planning Agency, told the McPhersons that it would be difficult to obtain a CUP for a C&D landfill. His written report on the property was submitted to the Topeka-Shawnee County Metropolitan Planning Commission's Zoning and Platting Committee (Committee) and the Board. Paris noted that the subject property in its current condition was not suitable for redevelopment. In order to develop the land, the property would have to be subjected to a reclamation process to remove deposits of silts and residues, and a further regrading of the topsoil process to "establish suitable ground for further construction activity."

The report also noted the following regarding the expected traffic:

"The applicant is expecting to generate an average of 25 additional vehicle trips per day to the site for deposit of construction and demolition debris. This average is subject to seasonal fluctuation, ranging from 16 trips per day in January to a high of 32 trips per day in October. The Shawnee County Public Works Department has granted heavy truck certification and approval for the proposed truck route to and from the proposed landfill site."

Paris also noted a concern for increased traffic based on increased residential growth and travel to and from such schools as Shawnee Heights High School, Shawnee Heights Middle School, and Tecumseh Elementary School. His report noted the Topeka-Shawnee County Growth Management Plan called for more urbanization in the area.

In conclusion, the Paris report recommended denial of the CUP application, concluding:

"8. As residential development in this area continues to grow, the significance of SE 29th Street as an arterial street will increase significantly.

"9. The introduction of regular truck traffic along this stretch of road will undoubtedly increase the timeframe governing the reconstruction of SE 29th Street to meet arterial street standards.

"10. Based on the classification of SE 29th Street as a minor arterial road, the current condition of this road appears to be substandard on order to meet the current and projected traffic demand east of SE Croco Road."

A day or two before the commission meeting, the McPhersons learned of Paris' report. According to the McPhersons, this was the first sign of potential difficulties with the application. However, the McPhersons had addressed traffic problems in their application. On average, MLI expected between 24 and 25 loads per day, and that the busiest times would be at 7 a.m. and 4 p.m. The application stated the belief that the traffic generated by Martin Marietta's quarry operation was greater than the traffic expected from a C&D landfill. The most common type of truck would be a single axle dump truck.

Consistent with his report, Paris testified in deposition that East 29th Street was not built to handle its intended capacity and that the road in its current condition would not be able to support a C&D landfill. When asked whether there were any alternative uses for the land, Paris said, "Any, any use could be placed on that property. The ground has not been reclaimed since its use as a quarry, but once reclaimed, regraded, anything could, could be built on that property." When asked to give examples, Paris continued:

*"The quarries immediately surrounding this particular site have all been reclaimed,* and they are currently being used as agricultural or pasture land. Several of them I believe also have houses on the property and the resulting pond from the quarry is just an amenity for use with the residential property. I know of several other former quarries that—where the actual pond is used as an amenity for an entire subdivision instead of a singular property. A site such as this could also be used for, for parks. They could be used—well, once the property is reclaimed, you know, the—aside from some construction, you know, building construction issues I mean anything could be built there." (Emphasis added.)

The Shawnee County Health Agency evaluated MLI's application. The report noted that no groundwater was found on the site and that there was a very limited chance that the drinking water supplies would be contaminated as a result of a C&D landfill on

the property. The potential impacts from dust, noise, and odor appeared to be sufficiently controlled.

The record contains a letter from Verne Dow, a geologist, criticizing the geology report submitted with MLI's application. According to Dow's letter, the report in MLI's application was vague and might have been based on information collected from the wrong site. Further, Dow's letter disputed that there was no groundwater in the area:

"I was Chief Geologist for the Kansas Division of Martin Marietta from January 1963 to April 1974 and worked often at the East Topeka quarry. During that time there was groundwater seepage into the pits from points on the highwall to the base of the Ozawkie. Since groundwater is present in the area it must be considered in the design."

### The Zoning and Platting Committee meeting July 19, 2000

The Committee held a special meeting on July 19, 2000, to consider MLI's application. The McPhersons' attorney, Mark Buck, spoke in favor of the application, along with Kenny Blair and Bob Roenbaugh.

Buck noted that the traffic count for 29th Street was 2,817 cars daily and that an increase of 25 to 30 cars per day was insignificant. He told the Committee that the C&D landfill would not be visible from either 29th Street or Ratner Road. Kenny Blair, an engineer with the firm of Cook, Flatt, and Strobel, said the use of the former quarry as a C&D landfill would cause no problems and that the money generated could eventually be used to fund reclamation of the property. Roenbaugh, who owns property adjacent to the McPhersons' property, did not expect that the C&D landfill would make a poor neighbor. Twenty-four citizens spoke in opposition to the application.

The Committee voted 7 to 0 against the CUP application.

In his deposition, Scott McPherson described the meeting of the Committee as a "circus." He noted inaccurate information was presented, including allegations that MLI would be burning tires, dumping environmentally sensitive materials and other toxic waste, and polluting the water. Scott McPherson further stated that Dave

Ireland, chairman of the Committee, later told him that a vote to approve the application would have been "political suicide."

*The Board's Hearing August 14, 2000*

The McPhersons understood that no member of the Board promised approval of the application for a C&D landfill before the hearing. However, Ireland told the McPhersons there were sufficient votes on the planning commission for approval and that he was going to see to it that the application was approved. The McPhersons understood there were no guarantees, as indicated by the following disposition testimony:

"Q. [To Virgil McPherson] Did they at any time tell you that there were no guarantees in the conditional use permit process?

"A. I'm sure they did, because there isn't.

"Q. Okay. And you believe there aren't any guarantees in this process?

"A. Yeah."

At the Board's August 14, 2000 hearing, Paris spoke on behalf of the Planning Agency staff. He summarized his report, focusing on the additional growth expected in the area and the expectation that traffic would be a problem in 5 to 10 years. The McPhersons' attorney spoke in favor of the application. Buck "acknowledged the Commission received approximately 132 form letters, numerous telephone calls, faxes, and contacts from the residents."

Again, Blair spoke in favor of the McPhersons' application. Blair told the Board that the Kansas Department of Health and Environment (KDHE) would issue a permit, make annual reviews, and determine annually whether to continue the permit. Phil Rosewicz, a representative with KDHE, confirmed that the C&D landfill could be shut down for noncompliance with applicable regulations.

There were no additional speakers in favor of the application, and Scott McPherson admitted in his deposition testimony that the McPhersons presented all their available information to the Board.

Twenty-four people spoke in opposition to the application. Charles Benjamin, an attorney representing a homeowners association, showed the Board a picture of a C&D landfill managed by the McPhersons. Benjamin raised the concern that landfills, whether sanitary landfills or C&D landfills, would attract dumping,

*i.e.*, people dumping their things off by the side of the road in the vicinity of the landfill.

Robert Badenoch, who described himself as an appraiser, told the Board he had reviewed some appraisal literature and concluded that the value of property within a 5-mile radius would be adversely affected by an active C&D landfill. Further, Badenoch mentioned that property taxes, which are assessed based upon the value of the property, would decrease and thereby place fiscal strain on the county. Badenoch's written submission to the Board included a bibliography of eight articles addressing the impact landfills have on surrounding property values.

Gary Reynolds, the Shawnee Heights School District Superintendent, spoke in opposition. Reynolds said the C&D landfill would "impact four of their six attendance centers and indirectly impact the traffic to the other two facilities." Reynolds said the school board had adopted a resolution supporting those opposed to the application.

Steve Bolton, the Shawnee County Director of Refuse, said if the existing C&D landfill was closed, the county's operating expense at the Rolling Meadows Landfill would increase by $40,000 annually.

The Board voted to reject MLI's application, with Commissioners Meier and Ensley voting against the application and Commissioner Kane voting in favor of the application. The Board's findings of facts noted the following potential problems:

"8. The introduction of regular, heavy truck traffic along this stretch of road will undoubtedly affect the timeframe governing the reconstruction of Southeast 29th Street to meet arterial street standards. Based on the classification of Southeast 29th Street as a minor arterial road, the current condition of this road appears to be substandard to meet the current and projected traffic demand east of Croco Road.

"9. Southeast 29th Street is characterized as being hilly in this area and currently has minimal shoulder areas in the event of traffic problems or accidents. While this is likely adequate for normal vehicle traffic, additional heavy truck traffic and, more specifically, turning truck traffic at this location could substantially increase the risk of serious accidents occurring. Coupled with the projected increases in traffic as this area develops, this presents a grave concern.

"10. Environmental concerns have been presented in regards to potential water pollution. A large pond/lake is located on the relevant quarter section and crosses

the southwest quarter of the proposed site for the construction and demolition landfill. Studies and borings completed were reportedly done to the north of 29th Street and not in the specific area where the proposed landfill is to be located. The applicant could not completely address the possibility or such contaminants entering the groundwater system.

"11. Other uses for the property have been identified including pasture or agricultural use, a recreational complex utilizing the lake on the property or potential future residential development. While these alternative uses may not be as profitable as the proposed use, they are legitimate alternative uses."

### Commissioner Kane

Prior to the Board's hearing, Ireland brought Commissioner Kane to the 29th Street and Ratner Road site and the McPhersons talked with her about the landfill project. Commissioner Kane indicated that, on any give issue, if she was for the issue, Commissioners Ensley and Meier were against the issue 99% of the time. The McPhersons spoke with Commissioner Kane on multiple occasions. They had the impression Commissioner Kane would vote in favor of the CUP application. Voth said Commissioner Kane was supportive of the proposal.

### Commissioner Meier

Commissioner Meier said the McPhersons initiated two to four conversations regarding the application. Scott McPherson's deposition testimony indicates Commissioner Meier spoke favorably about the project prior to the purchase of the 678 acres from Martin Marietta. Voth confirmed in his deposition that Commissioner Meier was initially in favor of the proposal.

After MWI purchased the property from Martin Marietta, Commissioner Meier wrote a letter dated April 14, 1999, to the McPhersons. Commissioner Meier noted that he had received telephone calls expressing concern that the McPhersons would be applying to operate a C&D landfill on the property. Commissioner Meier stated that the purpose of his letter was to "gather information on [the potential application] prior to the Commission hearing [the] request." In the letter, Commissioner Meier asked several questions, including a question about traffic patterns of trucks seeking access to the landfill. Commissioner Meier noted that there had been an application in 1998 to place a commercial building

approximately 2 miles from MLI's property, but he had nevertheless voted against the application, although the commercial building was less obtrusive than the proposed operation of a C&D landfill. Commissioner Meier ended the letter by suggesting that he believed "it is in the best interests of the community to find more suitable locations where access will not be an issue."

At the Board's hearing, Commissioner Meier said that he had given thought to this issue for months and that he had received numerous calls from people who did business with the McPhersons saying there was no one with more integrity.

Commissioner Meier's deposition testimony indicates the calls regarding MLI's CUP application were 20 to 1 against approval of the application.

Virgil McPherson said that he never spoke with Commissioner Meier on the issue.

Commissioner Meier testified in his deposition that he did not attend any of the meetings held by those opposed to the McPhersons' application. He said that at the time of his vote, he was a lame-duck member of the Board. Regarding the political pressure to vote against the application, Commissioner Meier testified that it was never a concern of his on votes in 4 years.

### Commissioner Ensley

The McPhersons met with Voth and Commissioner Ensley. According to Scott McPherson, the meeting took place early in 2000. Commissioner Ensley said he was not in favor of the conditional use permit. According to Voth, Commissioner Ensley disapproved of using the property as a C&D landfill, having recalled that he received numerous calls from people complaining of Martin Marietta's quarry operation and did not want to get those types of calls anymore. According to Voth, the meeting with Commissioner Ensley was before the purchase of the property from Martin Marietta:

"It was before they purchased the property. I wanted to be sure that Virgil wasn't misled and bought that piece of property thinking that he was assured in any way, and Ensley made this very clear at that meeting, too, that there were no assurances. He was welcome to do whatever he wanted, but there was no assurances that he'd glean a permit on that, on that property."

Commissioner Ensley said in his deposition that there was a "higher and best use for the property . . . than a demolition landfill," but did not know what that use would be. Commissioner Ensley explained why he would reserve his final decision until the public hearing: "Because you don't have all the information. New information may come forth at a public hearing that's not available to you prior to that."

Commissioner Ensley testified he did not attend any of the meetings held by the interested landowners opposed to the McPhersons' application.

### District Court

MLI filed a petition for review with the district court. The district court heard oral arguments and filed its memorandum decision granting the Board summary judgment, and MLI timely appealed.

### Due Process

#### 1. Prejudgment

MLI contends that the decision of the Board is void based upon a violation of MLI's due process rights under the United States Constitution. The proceedings before the Board with regard to MLI's CUP application were quasi-judicial. Thus, due process attached to the proceedings and those proceedings must have been fair, open, and impartial. MLI's challenge relates to impartiality and specifically to the statements made by Commissioners Meier and Ensley before the formal hearing. MLI claims that those statements established that both commissioners had prejudged the merits of the application before all of the evidence was presented at the formal hearing. The hearing and final decision was, according to MLI's contention, unfair and tainted by the commissioners' prejudgment.

There are no Kansas cases on the issue of prejudgment in a zoning decision. The Kansas Court of Appeals discussed a similar issue in reviewing a decision by the Kansas Corporation Commission (KCC) involving the "conditional approval" of a settlement agreement by all parties before an official hearing. *Farmland In-*

*dustries, Inc. v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 172, 943 P.2d 470, *rev. denied* 263 Kan. 885 (1997). The question posed by the court was whether the KCC's "conditional approval" of the agreement constituted a prejudgment of the issues and violated due process of law. In its order of conditional approval, the KCC noted that it had not issued a final order approving the agreement and that "it would decide upon the reasonableness of the amended settlement agreement after hearing all the evidence." 24 Kan App. 2d at 188. The court concluded that based upon the order itself, the KCC remained open to additional evidence and denied the prejudgment claim. 24 Kan. App. 2d at 188.

*Farmland Industries* echos a common thread running through most of the quasi-judicial proceedings cases involving prejudgment. See Annot., *Disqualification for Bias or Interest of Administrative Officer Sitting in Zoning Proceeding,* 10 A.L.R. 3d 694, § 6; 83 Am Jur. 2d, Zoning and Planning § 601; Dennison, *Zoning: Proof of Bias or Conflict of Interest in Zoning Decision,* 32 Am. Jur. Proof of Facts 3d 531, § 15. Most cases support the conclusion that prejudgment statements by a decisionmaker are not fatal to the validity of the zoning determination as long as the statement does not preclude the finding that the decisionmaker maintained an open mind and continued to listen to all the evidence presented before making the final decision. See *O&G Industries v. Planning & Zoning Commission,* 232 Conn. 419, 430, 655 A.2d 1121 (1995); *Madison River R. V. Ltd. v. Town of Ennis,* 298 Mont. 91, 94, 994 P.2d 1098 (2000) ("To prevail on a claim of prejudice or bias against an administrative decision maker, a petitioner must show that the decision maker has an 'irrevocable closed' mind on the subject under investigation or adjudication."); *Wagner v. Jackson Cty Bd of Zon. Adj.,* 857 S.W.2d 285, 289 (Mo. App. 1993) ("Familiarity with the adjudicative facts of a particular case, even to the point of having reached a tentative conclusion prior to the hearing, does not necessarily disqualify an administrative decisionmaker, in the absence of a showing that the decisionmaker is not capable of judging a particular controversy fairly on the basis of its own circumstances.").

MLI advances the following cases in support of its contention that Commissioners Meier and Ensley prejudged its CUP application. *Barbara Realty Co. v. Zoning Bd. of Cranston*, 85 R.I. 152, 128 A.2d 342 (1957); *Lage v. Zoning Board of Appeals*, 148 Conn. 597, 172 A.2d 911 (1961); *McNamara v. Saddle River*, 60 N.J. Super. 367, 158 A.2d 722 (1960). The cases provide little if any support and may be distinguished on their particular facts.

*Barbara* reviewed a zoning board's decision to grant an application for a variance in a residential zone for the use of a motor lodge. Mancini, one of the objectors to the variance before the zoning board and a petitioner on appeal, told Harris, a member of the zoning board, that there would be an objection to the application for a variance. Harris, a decisionmaker, replied, "What difference does it make, we are going to shove it down your throat anyway." 85 R.I. at 154. On appeal, the objectors argued the board erred in refusing to disqualify Harris because the evidence showed that Harris had prejudged the matter before it and, therefore, could not render a fair and impartial decision. The court agreed, concluding that the principles of impartiality had been violated. 85 R.I. at 156-57. The statement, "we are going to shove it down your throat anyway," demonstrated that the zoning board member not only prejudged the matter, but also intended to ignore evidence not supporting his position.

Unlike *Barbara*, Commissioner Meier's letter asked questions and invited answers, which hardly suggests he precluded the consideration of further evidence on the matter. Commissioner Ensley's testimony indicated that he reserved his decision until the public hearing, which supports a conclusion that he considered all the evidence.

*Lage* reviewed a zoning boards' decision to grant a variance to permit the construction and operation of a grocery store in a residential zone. One of the board members had spoken in favor of the variance at a preliminary hearing before the planning commission. The court's analysis included the following:

"His remarks, however, indicate a preconceived opinion about the desirability of the change, and that opinion must have influenced his vote on the variance. Whether his attitude had any bearing on the decision of his comembers cannot

be known. The vote of the other four members would have been sufficient to grant the variance. In a somewhat similar situation, we held that a member of a zoning commission should have disqualified himself. *Mills v. Town Plan & Zoning Commission,* 144 Conn. 493, 496, 134 A.2d 250. Evarts would have shown much better judgment had he refrained from acting as a member of the board of appeals in this matter. The court should have allowed the introduction in evidence of the portion of the transcript concerning his statement before the planning and zoning commission. The statement could well have been preliminary to development of basis for absolute disqualification." 148 Conn. at 604.

*Lage* also fails to lend support to MLI's contention of prejudgment. In that case, the expression of a preconceived opinion at the public hearing suggested more than prejudgment—it suggested that the official had an interest in the matter and was acting more as an advocate, rather than as a quasi-judicial official. The suggestion that the official in *Lage* so strongly prejudged the matter that he would not consider further evidence is simply not present in the case we now review. In this case, the statements of Commissioners Meier and Ensley were not meant to influence the process, but were meant to help the McPhersons by giving them insight into the concerns harbored by the Board. Armed with this information, the McPhersons had an opportunity to address these concerns.

The last case cited by MLI, *McNamara,* involved allegations that a councilman's vote for an ordinance regulating private and parochial schools in residential zones was disqualified because of the councilman's self-interest. The court recognized the law generally permitted political office holders to vote consistently with preelection statements, but pointed out that the councilman had participated in legislation against the school at issue and also owned property close to the school. The court found the councilman's motivation was not based on civic interest but, rather, on his interest as a property owner. 60 N.J. Super. at 373-74. The "ultimate question" posed by the court was: "If *as a citizen* he opposed the establishment of the school, was [the councilman] qualified to vote on an ordinance?" (Emphasis added.) 60 N.J. Super. at 377. The court concluded that the zoning decision needed to be made "unaffected by personal considerations," an element the court found was lacking in the case of the councilman: "But in the subject

matter of the legislation he had a well developed and intense private concern. Its very presence could have impaired his capacity to act in the interest of the citizens at large." 60 N.J. Super. at 378.

The concern in *McNamara* involved personal interest. In this present case, there was no suggestion of personal interest. Again, the statements of Commissioners Ensley and Meier were potentially beneficial to the McPhersons in that they served to highlight the commissioners' concerns, which then could be addressed at the formal hearing with additional evidence.

The facts of this case as set forth in detail above are instructive. There was no indication that Commissioners Ensley and Meier failed to keep an open mind or failed to consider all the evidence. While Commissioner Meier sent a letter suggesting his opposition to the application, he asked a number of questions, which suggested he might be persuaded to support the application if certain facts were established. Further, in the case of Commissioner Ensley, while his statements indicated stronger opposition to the application, he testified in his deposition that he reserves final judgment for the hearing because of the potential that new evidence might surface. Based upon all the circumstances, we conclude that there was no prejudgment in this case.

## 2. Ex Parte Communications

With respect to the ex parte communications, it should be noted that the parties must be informed of the evidence submitted for consideration and must be provided an opportunity to respond and rebut the evidence. *Suburban Medical Center v. Olathe Community Hosp.*, 226 Kan. 320, 331, 597 P.2d 654 (1979). The American Jurisprudence, Second, encyclopedia notes that "a local legislator may confer *ex parte* with persons interested in a proposed zoning amendment." 83 Am. Jur. 2d, Zoning and Planning § 602. But in the present context, ex parte communications come under stricter review:

"However, when *ex parte* contacts are present in the context of quasi-judicial zoning decisions, such as variances and special use permits, courts will be more receptive to challenges to decisions on grounds of zoning bias. Still courts may simply try to avoid the issue altogether by concluding that the ex parte commu-

nications were eventually made part of the record decision, so that there was no denial of the due process right to a fair and impartial hearing." 32 Proof of Facts 531, § 16.

This court in *In re Petition of City of Overland Park for Annexation of Land,* 241 Kan. 365, 736 P.2d 923 (1987), considered ex parte contacts in the context of review of a district court decision affirming the Johnson County Board of County Commissioners' decision to permit Overland Park to annex property. The court found the parties opposed to the annexation had an opportunity to respond to the matters involved in the communications between the City and the Board and also noted that the Johnson County Board had received ex parte communications from those opposed to the annexation. 241 Kan. at 371-72.

The testimony of MLI's attorney before the Board suggests he knew letters were being sent to the commissioners. There is no suggestion in the record or in the briefs that matters contained in the letters or discussed in any other ex parte communications were not disclosed to MLI. The McPhersons indicated that they had presented the Board all the information they had available. Further, the inconsistency in MLI's positions on appeal and prior to the Board's decision when it lobbied for its application is worthy of consideration. Had the Board voted in favor of the CUP application, the same argument could be made by those opposed to the application, citing the McPhersons' conversations with board members both at the site and in a private meeting.

Our review convinces us that neither prejudgment nor ex parte communications rendered the final decision of the Board unlawful. MLI fails to establish that the proceedings before the Board denied it due process of law.

### Reasonableness

Before beginning the reasonableness analysis under *Golden,* MLI's complaint that the Board's failure to make timely formal findings of fact should be considered. Paris, the county planner, worked on the findings of fact as late as winter 2000. Initially, it should be noted that formal findings of fact are not required. *Board of Johnson County Comm'rs v. City of Olathe,* 263 Kan. 667, 678,

952 P.2d 1302 (1998). It is more important that there exists a record of what the Board considered before making its decision so that the reviewing court is not left in a "quandary" as to why the decision was made. See 263 Kan. at 679. No harm was found in a similar situation in *Landau v. City Council of Overland Park*, 244 Kan. 257, 767 P.2d 1290 (1989).

In *Landau*, the findings of fact had not been made until 6 months after the relevant decision and after the aggrieved party had filed a notice of appeal. The court still determined that at least two of the *Golden* factors had been considered. Further, the *Landau* court noted the minutes revealed that the views expressed by citizens at the public hearing addressed the additional *Golden* factors. *Landau*, 244 Kan. at 262-63. Similarly, the planning staff in the present case did not recommend approval of the application and, as the analysis below shows, the citizens' views address additional *Golden* factors. As in *Landau*, the record does not leave this court in a quandary as to what motivated the Board to act, and the argument that these findings were inadequate because they were made after the Board's hearing fails.

MLI contends that the Board's denial of the CUP was unreasonable and arbitrary. The factors announced in *Golden* for testing the reasonableness of zoning decisions are applicable in reviewing the Board's decision. See *K-S Center Co. v. City of Kansas City*, 238 Kan. 482, 495, 712 P.2d 1186 (1986) ("We have consistently held, in reviewing the grant or denial of a special use permit, the same test of 'reasonableness' applies as in rezoning cases."). Just as the Board and the district court did, we consider the following *Golden* factors to test the reasonableness of the Board's denial:

### (1) *The character of the neighborhood*

The Board found that "[t]he site lies in a growing residential area with substantial residential development just to the west of the proposed location." The Board heard testimony from many of the people who own houses near the proposed C&D landfill site. Thus, the Board was reasonable when it concluded the neighborhood was residential.

(2) *The zoning and uses of properties nearby*

The Board noted the area surrounding MLI's proposed site is zoned as RR-1. MLI does not dispute this finding but, rather, emphasizes that its property has been used for quarrying activities, which are also classified along with a C&D landfill as a use permitted by a conditional use permit. According to MLI, the operation of a C&D landfill is a nonconforming use and, thus, has become a vested right.

While this *Golden* factor relates to the "zoning and uses of properties *nearby*," 224 Kan. at 598, we pause briefly to address MLI's argument concerning nonconforming use. MLI argues its operation of a C&D landfill would be a nonconforming use and, therefore, a vested right. See *Goodwin v. City of Kansas City,* 244 Kan. 28, 32, 766 P.2d 177 (1988). The district court noted that under the possible uses permitted by a conditional use permit, operation of a quarry, City of Topeka-Shawnee County Comp. Zoning Reg., App. C, Art. III, § 48-3.02(c)(5) (1999), and operation of a C&D landfill, City of Topeka-Shawnee County Comp. Zoning Reg., App. C, Art. III, § 48-3.02(c)(17), are under separate subsections. The operation of a quarry under § 48-3.02(c)(5) includes a number of various activities: "Extraction, processing, storage, and sale of raw materials, including ore, minerals, sand, rock, stone, gravel, topsoil, fill dirt, and other materials delivered by quarry, mining, dredging, or stripping operations." With respect to nonconforming uses, the Topeka-Shawnee County zoning regulations provide that a nonconforming use may be changed to another nonconforming use of the same restricted classification. The regulations define classification as the "[d]ivision of uses or activities into groups *or subgroups* for regulatory purposes." (Emphasis added.) City of Topeka-Shawnee County Comp. Zoning Reg., App. C, Art. XXXV (1999). However, the right to a nonconforming use is to be strictly construed. *Goodwin,* 244 Kan. at 32. Thus, under a strict construction of nonconforming use, the operation of a C&D landfill is not a nonconforming use because not only is the operation of a C&D landfill substantially different from the operation of a quarry, but also the C&D landfill is not within the various uses classified in §

48-3.02(c)(5). However, assuming a valid nonconforming use existed at one time, if the use has been discontinued for a year, the privilege of nonconforming use would be lost. Martin Marietta's quarry operations ended in 1993, but material continued to be removed until 1998. MLI's application was made in March 2000. Thus, even if a C&D landfill would be a nonconforming use, any such use had long since become unavailable under the zoning regulations.

Thus, MLI's emphasis on the zoning classification of its own property misses the mark. The evidence of record supports the Board's finding that the nearby properties are zoned and used as residential areas.

(3) *The suitability of the subject property for the uses to which it has been restricted*

With respect to the alternative uses for the property, the Board made the following finding:

"11. Other uses for the property have been identified including pasture or agricultural use, a recreational complex utilizing the lake on the property or potential future residential development. While these alternative uses may not be as profitable as the proposed use, they are legitimate alternative uses."

MLI maintains the property can only be used as a C&D landfill. The Board, however, disagreed and identified several alternative uses of the property in question. While the Board conceded that the property, in its current state and until it has gone through a reclamation process, was unsuitable for residential use, the Board did not limit its consideration to residential use. As indicated by finding No. 11, several alternative uses were found to exist. There is substantial competent evidence of record to support the Board's finding regarding alternate uses of the property in question. Given our standard of review, we conclude that the Board's finding that the property in question was suitable for a number of alternative uses is a reasonable conclusion.

(4) *The extent to which removal of the restrictions will detrimentally affect nearby property*

The Board did not make a specific finding with respect to the detrimental effect the operation of a C&D landfill would have on the nearby property. The Board reserved the traffic and environmental concerns for the public health, safety, and welfare factor below, and focused instead on the potential dirt, noise, trash, and potential decline in property values. It its brief, MLI inserts the word "neighborhood" into the analysis and repeats the argument that the surrounding areas were used for quarrying activities.

Despite the fact that the Board did not make any specific findings with respect to the detrimental affect on nearby properties, the *Golden* factors are suggestions only and each *Golden* factor need not be considered to make the ultimate decision reasonable. See *Landau*, 244 Kan. at 263.

(5) *The length of time the subject property has remained vacant as zoned*

The Board noted that quarrying activities ceased in 1993. Thus, at the time of the Board's vote, the property had been vacant for 7 years. However, Martin Marietta had continued to remove material from the site until 1998. Thus, the property had been idle for 3 years at the time of the Board's hearing. Given the Board's finding regarding alternative uses of the property, its conclusion that there was no reason to believe that the property would remain vacant was a reasonable conclusion supported by the evidence of record.

(6) *The relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property as compared to the hardship imposed upon the individual landowner*

With respect to the gain to safety by denying MLI the CUP application to operate a C&D landfill, the Board made the following findings:

"5. Southeast 29th Street is a primary route for students traveling to and from Shawnee Heights High School, Shawnee Heights Middle School, and Tecumseh Elementary School during early morning and midafternoon hours. The applicant projected that the busiest hours of operation of the construction and demolition landfill site would be between 7:00 a.m. and 8:00 a.m. and again in the afternoon between 4:00 p.m. and 5:00 p.m. These projected hours coincide with those times

that students are traveling to school in the morning, and in many cases, leave school after extracurricular activities in the afternoon.

. . . .

"7. As residential development continues to grow, likely eastward, the significance of Southeast 29th Street as an arterial street will increase significantly.

"8. The introduction of regular, heavy truck traffic along this stretch of road will undoubtedly affect the timeframe governing the reconstruction of Southeast 29th Street to meet arterial street standards. Based on the classification of Southeast 29th Street as a minor arterial road, the current condition of this road appears to be substandard to meet the current and projected traffic demand east of Croco Road.

"9. Southeast 29th Street is characterized as being hilly in this area and currently has minimal shoulder areas in the event of traffic problems or accidents. While this is likely adequate for normal vehicle traffic, additional heavy truck traffic and, more specifically, turning truck traffic at this location could substantially increase the risk of serious accidents occurring. Coupled with the projected increases in traffic as this area develops, this presents a grave concern.

"10. Environmental concerns have been presented in regards to potential water pollution. A large pond/lake is located on the relevant quarter section and crosses the southwest quarter of the proposed site for the construction and demolition landfill. Studies and borings completed were reportedly done to the north of 29th Street and not in the specific area where the proposed landfill is to be located. The applicant could not completely address the possibility or such contaminants entering the groundwater system."

MLI separately addresses the traffic concerns prior to addressing the *Golden* factors. Under this sixth *Golden* factor, MLI focuses on the loss the county will suffer if the application is denied. This argument implies that there are no alternative sites for a C&D landfill in Shawnee County or any other sufficiently close location.

With respect to the traffic concerns, the Board found the roads used by trucks driving to or from the C&D landfill would also be used by people driving to or from one of three schools in the area. Further, the Board found that the times of heaviest traffic to and from the C&D landfill would in part overlap with the times of busiest traffic to and from the schools.

MLI disputes the reasonableness of the findings. MLI points out that the county public works department granted heavy truck certification and approval for trucks driving to and from the proposed C&D landfill site. MLI argues the 25 additional trips per day do not amount to significant concern. Further, MLI stresses

the fact that the traffic associated with the C&D landfill would be less than that associated with the quarry.

MLI cites *Taco Bell v. City of Mission,* 234 Kan. 879, 678 P.2d 133 (1984), to support its position. This court in *Taco Bell* affirmed the district court, which had found the City of Mission acted unreasonably, arbitrarily and capriciously in a zoning decision. With regard to traffic, this court found the City of Mission was unreasonable in citing traffic concerns because the evidence showed the development would not attract any additional traffic. 234 Kan. at 890.

*Taco Bell* can be distinguished from the situation in which a particular use attracts traffic. That is exactly the situation with MLI's proposed C&D landfill, which would attract traffic. Therefore, traffic is a valid concern. Further, *Taco Bell* stands for the proposition that citations to general terms such as "traffic" are, without more, insufficient. See 234 Kan. at 891 ("We warned in *Golden* of the danger of a governing body relying on such general considerations as 'traffic problems' and 'traffic congestion' to control zoning decisions."). In this case, there would be a combination of increased traffic along with specific safety concerns, *i.e.,* the combination of truck traffic with school traffic.

The traffic at issue in this case is different from that in *Taco Bell.* Passenger cars were not in issue in this case, but rather the issue concerns larger trucks loaded with materials bound for a C&D landfill. The Paris report noted that the route has been used by students to attend school or school functions and that this use was expected to increase in the future. The report also noted that the urbanized area of Topeka was growing eastward and that "special consideration should be given not only to observed current traffic conditions in the area, but also to the projected traffic patterns."

With regard to the county public work's approval of the truck route, it is not clear how the approval relates to traffic safety as opposed to the road's capacity to accommodate the trucks without damage.

With respect to the environmental concerns, the Board points out how geologist Dow's review of MLI's application questioned MLI's conclusion that there was no concern for groundwater con-

tamination. Dow's letter indicated that there was groundwater seepage at the "East Topeka" quarry. Buck told the Board that further investigation in response to Dow's letter tended to show Dow's analysis was incorrect. However, Rosewicz, a representative with the KDHE, told the Board that while the risk was minimal from this type of landfill, he could not be certain that there would be no groundwater contamination.

Chris Etcheson, an employee with the Shawnee County Health Agency, told the Board, in response to a question from Commissioner Kane, that there was a "possibility for airborne particles from asbestos in an operation of that type" despite the prohibition from dumping asbestos in a C&D landfill. Commissioner Meier asked Etcheson whether the McPhersons' other C&D landfill had ever contained any impermissible materials, and Etcheson said that this had happened in the past.

Kim Nettleson, a recycling coordinator, said there would be some dust associated with the C&D landfill.

Since "relative" gain implies a balance between the advantages and disadvantages of the denial of the application, the above disadvantages to the application should be first offset by the advantages to granting the application before comparing that "relative gain" to the hardship imposed upon the landowner. MLI emphasizes the county's need for an additional C&D landfill to remain competitive in economic development. The Board found that other sites were available for a C&D landfill and that those sites would have the added benefit of not being located in growing residential areas.

Regarding the hardship imposed on MLI, the evidence showed MLI paid less than $10,000 for its property. Of course, this hides the fact that MWI, MLI's parent, paid Martin Marietta between $500,000 and $600,000 for the property. Further, MLI points out the potential lost revenue amounts to $7.2 million.

The inquiry as to reasonableness should focus on the evidence presented to the Board. See *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980) ("Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to

the zoning authority."). As the Board points out, the information regarding MWI's and MLI's investments was not presented to the Board.

In conclusion, MLI might dispute the Board's judgment of these factors, but it is clear the Board considered the evidence presented and made its decision. We conclude that the Board's decision is reasonable and not one so wide of the mark that the decision lies outside the realm of fair debate.

(7) *Recommendation of the permanent or professional staff*

With regard to professional staff recommendations, the Board noted the following:

"14. The Topeka-Shawnee County Metropolitan Planning Department Staff recommended DISAPPROVAL of the proposal in its report to the Metropolitan Planning Commission.

"15. At a public hearing on July 19, 2000, the Zoning and Platting Committee of the Topeka-Shawnee County Metropolitan Planning Commission considered the proposal and at the conclusion of the hearing recommended unanimously to the Board of Shawnee County Commissioners that the request be DISAPPROVED by a vote of 0-7-0-0."

MLI concedes the professional staff factor weighs against its position but emphasizes that Paris, the planner, was inexperienced and that he admitted that the question was a close one.

(8) *The conformance of the requested change to the adopted or recognized master plan*

With respect to the plan, the Board made the following findings:

"6. The subject property lies approximately ½ mile east of the current urban services boundary as reflected on the 2010 Future Land Use Plan, and approximately ¼ mile east of the proposed Growth Management Plan currently being drafted by the Metropolitan Planning Staff."

The Paris report confirms the above. Paris wrote that "[u]nder both the currently adopted future land use plan, and the draft Growth Management Plan, *urban density development is projected,* and in fact encouraged to within a close proximity to the subject property." (Emphasis added.)

*Conclusion*

This court is limited to determining the reasonableness of the Board's action. An action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate. *Combined Investment*, 227 Kan. at 28. We are limited to determining whether the given facts could reasonably have been found by the Board to justify its decision. *Golden*, 224 Kan. at 595-96. The above analysis of each factor should not be viewed as a reweighing of the evidence but, rather, a process of pointing out how the Board's findings of facts were reasonable in light of the record on appeal. While there is evidence in the record to support the granting of MLI's application—indeed the Board's vote was not unanimous—in light of our standard of review, we will not disturb the Board's decision in this case.

MLI raises two additional arguments concerning the Board's denial of a conditional use permit to establish and operate a C&D landfill. The first claim is that the denial amounted to a taking under the Fifth and Fourteenth Amendments to the United States Constitution. The second argument contends that MLI is entitled to relief under 42 U.S.C. § 1983 (2000). Both arguments lack merit.

*Taking of Property*

MLI knew that the property it purchased from Martin Marietta was zoned residential. Before the purchase, its parent corporation, MWI attempted to make the deal contingent upon successful rezoning of the property for a C&D landfill. Martin Marietta rejected the contingency, and the property was nevertheless purchased. More importantly, there are alternative uses for MLI's property. While the alternatives might not be as lucrative as the operation of a C&D landfill, the alternatives exist and preclude a finding that the Board has taken the entire value of the property.

The Fifth Amendment to the United States Constitution restricts governmental taking of property: "[N]or shall private property be taken for public use, without just compensation." That provision applies to the States through the Fourteenth Amendment.

*Chicago, Burlington &c. R'D v. Chicago,* 166 U.S. 226, 241, 41 L. Ed. 979, 17 S. Ct. 581 (1897).

MLI relies solely on *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992). In *Lucas,* a South Carolina law prohibited the property owner from erecting any permanent habitable structures on his land, which rendered the property valueless. The Court's analysis began with Justice Holmes' often quoted words in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 67 L. Ed. 322, 43 S. Ct. 158 (1922), warning that compensation is required if regulation goes "too far." 505 U.S. 1014 (quoting *Pennsylvania Coal*). Then, the Court noted the lack of specific guidance for determining when, and under what circumstances, regulations went too far, with two exceptions. First, as shown in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 73 L. Ed. 2d 868, 102 S. Ct. 3164 (1982), a physical invasion of property amounts to a compensable taking. 505 U.S. at 1015. Second, there is a compensable taking "where regulation denies all economically beneficial or productive use of land." 505 U.S. at 1015. The Court, most recently in *Tahoe-Sierra Preserv. Council v. Tahoe Reg. Planning Agency,* 535 U.S. 302, 330, 152 L. Ed. 2d 517, 122 S. Ct. 1465 (2002), confirmed the narrow application of *Lucas* rule:

"But our holding [in *Lucas*] was limited to 'the *extraordinary circumstance when no productive or economically beneficial use of land is permitted.*' [Citation omitted.] The emphasis on the word 'no' in the text of the opinion was, in effect, reiterated in a footnote explaining that the categorical rule would not apply if the diminution in value were 95% instead of 100%. [Citation omitted.]" (Emphasis added.)

If the entire value of the property is not destroyed, then the analysis under *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 57 L. Ed. 2d 631, 98 S. Ct. 2646, *reh. denied* 439 U.S. 883 (1978), is appropriate. *Tahoe-Sierra,* 535 U.S. at 330.

The Court in *Penn Central* considered whether restrictions imposed by the City of New York, which prevented substantial additions to Grand Central Station, amounted to a taking. The Court noted the difficulty involved in determining what amounts to a taking and that the "ad hoc, factual inquiries" of determining when

" 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." 438 U.S. at 123-24 (citing *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 8 L. Ed. 2d 130, 82 S. Ct. 987 [1962]). The Court identified factors that help in the inquiry: (1) the economic impact of the regulation, focusing on the investment-backed expectations of the owner; and (2) the character of the governmental action, *i.e.,* whether a physical invasion is involved, rather than an interference "adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124. The Court went on to note the following with regard to zoning laws:

"More importantly for the present case, in instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests. [Citation omitted.] Zoning laws are, of course, the classic example, [citations omitted] which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property. [Citations omitted.]

"Zoning laws generally do not affect existing uses of real property, but 'taking' challenges have also been held to be without merit in a wide variety of situations when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm." [Citation omitted.] 438 U.S. at 125.

The owners of the terminal in *Penn Central* argued the airspace above the terminal amounted to a "valuable property interest," which the city had taken. 438 U.S. at 130. The Court rejected this argument:

"Apart from our own disagreement with appellants' characterization of the effect of the New York City law, . . . the submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable. Were this the rule, this Court would have erred not only in upholding laws restricting the development of air rights, [citation omitted] but also in approving those prohibiting both the subjacent, [citation omitted] and the lateral [citation omitted] development of particular parcels. [Citations omitted.] 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been en-

tirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole -here, the city tax block designated as the 'landmark site.' " 438 U.S. at 130-31.

The Court noted that a regulation does not amount to a taking merely because it significantly diminishes the value of the property. 438 U.S. at 131.

This court in *Jack v. City of Olathe,* 245 Kan. 458, 470, 781 P.2d 1069 (1989), held that there is not a taking following the failure to rezone:

"The cases are further distinguishable from the present case in that the various governmental bodies involved had taken affirmative action to restrict and take away a right to the use of property which already existed. In the present case the action of the City was merely to deny the expansion of the existing right to use the property. No taking of the plaintiffs' property has been shown in the present case."

We conclude that the Board's denial was not a taking under the Fifth Amendment to the United States Constitution but was a decision to deny the expansion of the existing right to use the property.

### 42 U.S.C. § 1983

MLI contends it is entitled to relief under 42 U.S.C. § 1983, which provides as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any *rights, privileges, or immunities secured by the Constitution and laws,* shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." (Emphasis added.)

One seeking relief under 42 U.S.C. § 1983 must satisfy the following two requirements: (1) Some person must deprive the plaintiff of a federal right; and (2) that person must have acted under color of state or territorial law. See *Cook v. City of Topeka,* 232 Kan. 334, 340, 654 P.2d 953 (1982). MLI fails to satisfy the first require-

ment by failing to establish that the Board deprived it of a federal right.

Affirmed.