(243 P.3d 374)
No. 103,616

JEFFREY EVANS and JOANNE EVANS, *Appellants*, v. CITY OF EMPORIA, *Appellee*, and WESTAR ENERGY, INC., (Intervenor), *Appellee*.

Opinion filed November 19, 2010.

*C. Edward Peterson*, of Kansas City, Missouri, for appellants.

*Blaise Plummer*, city attorney, for appellee City of Emporia.

*Martin J. Bregman*, of Topeka, for appellee Westar Energy, Inc.

Before PIERRON, P.J., GREEN and MARQUARDT, JJ.

PIERRON, J.: Jeffrey and Joanne Evans appeal the district court's decision to uphold the City of Emporia's (City) granting of a conditional use permit (CUP) to Westar Energy, Inc., (Westar) to upgrade an existing electrical substation in the Evans' neighborhood. The Evans argue the court erred in finding the City was reasonable in granting the CUP with only limited restrictions; that the expansion of the substation should have required the entire station to be brought into code compliance; and the court erred in denying their petition to join additional plaintiffs. We affirm.

The facts in this case are fairly straightforward. The property owned by Westar has been used as an electric substation since 1937. Over time the property around the substation has developed and changed to mostly residential. The Evans' house was built next to the substation in 1977. The Evans purchased their house in 2004. Upon the adoption of the 1986 zoning regulations, the area including Westar's substation was zoned single family, low density residential. However, the substation was grandfathered in under the zoning regulations as a legal nonconforming use.

Westar made two relatively recent upgrades to the substation. In 1980, Westar added a transformer. In 2000, Westar brought in additional equipment. Early in 2008, Westar approached the City about adding equipment to the substation and extending the equipment coverage on the property an additional 100 feet. The City

decided that Westar would be required to file for a CUP in order to complete the expansion.

On August 18, 2008, Westar filed an application for a CUP to expand the equipment coverage of its electric substation 100 feet and add a fourth transformer. Westar indicated that approval of the CUP would provide sufficient, reliable power for east Emporia and allow the existing substation to meet the community's growing need for power. Westar's CUP was discussed at two meetings before the Emporia Lyon County Metropolitan Planning Commission (September 23, 2008, and October 28, 2008) and three meetings before the Emporia City Commission (October 22, 2008, and November 5 and 19, 2008). Protest petitions were filed by the Evans, David and Lupe Villar, Stephen Gfeller, Juan Flores, Sara J. Kelly Trust, Bill Oswald, Erma Tucker, and Nathaniel Jones. The proceedings before the planning commission and the city commission involved lengthy and detailed discussion of the issues in this case. The protestors presented evidence and testimony in opposition to expanding the substation and focused their arguments on noise abatement, aesthetics, stray voltage, and electromagnetic fields (EMF's).

On October 28, 2008, the planning commission passed a motion to approve Westar's CUP with two conditions: (1) Westar would construct a 9-foot decorative concrete wall on the north and south sides of the property and a 9-foot chain link fence on the east and west ends of the area, and (2) any future expansions of the substation would require an amendment of the CUP. On November 19, 2008, the city commission unanimously adopted the planning commission's recommendation and granted Westar's CUP with the two suggested restrictions.

The Evans filed a petition for judicial review on December 16, 2008. They argued the city commission's approval of Westar's CUP was unreasonable. The district court conducted a full hearing on the matter allowing full argument by both sides. The court entered an extensive memorandum decision affirming the approval of Westar's CUP. The court found the record demonstrated the planning commission and the city commission balanced the interest of Westar with the interest of the surrounding owners and the interest

of the community and the Evans failed to prove the unreasonableness of the City's decision.

The Evans appeal.

The Evans first argue it was unreasonable for the City to grant Westar's CUP without mandating additional restrictions or modifications for noise abatement, aesthetic concerns, stray voltage, and EMF's. The Evans also contend the district court "improperly deferred to the City's shallow and flawed decision-making process and further failed to recognize errors in the zoning decision."

Zoning decisions are judged by a reasonableness standard. See K.S.A. 12-760(a). The appellate court, like the trial court, reviews a zoning board's decision by a reasonableness standard based on the facts. *Rodrock Enterprises, L.P. v. City of Olathe*, 28 Kan. App. 2d 860, 863, 21 P.3d 598, *rev. denied* 271 Kan. 1037 (2001). The Kansas Supreme Court discussed the standard of review of zoning issues in *McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 304-05, 49 P.3d 522 (2002):

" '(1) The local zoning authority, and not the court, has the right to prescribe, change or refuse to change, zoning.

" '(2) The district court's power is limited to determining
 (a) the lawfulness of the action taken, and
 (b) the reasonableness of such action.

" '(3) There is a presumption that the zoning authority acted reasonably.

" '(4) The landowner has the burden of proving unreasonableness by a preponderance of the evidence.

" '(5) A court may not substitute its judgment for that of the administrative body, and should not declare the action unreasonable unless clearly compelled to do so by the evidence.

" '(6) Action is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate.

" '(7) Whether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority.

" '(8) An appellate court must make the same review of the zoning authority's action as did the district court.' "

The *McPherson* case also quoted our Supreme Court in *Golden v. City of Overland Park*, 224 Kan. 591, 598, 584 P.2d 130 (1978), and *Board of County Comm'rs v. City of Olathe*, 263 Kan. 667,

677, 952 P.2d 1302 (1998), listing eight factors to assist courts in reviewing whether a zoning authority's final decision was reasonable. The *Golden* factors to assist courts in reviewing whether a zoning authority's final decision was reasonable are:

" '(1) [t]he character of the neighborhood;

" '(2) the zoning and uses of properties nearby;

" '(3) the suitability of the subject property for the uses to which it has been restricted;

" '(4) the extent to which removal of the restrictions will detrimentally affect nearby property;

" '(5) the length of time the subject property has remained vacant as zoned;

" '(6) the gain to the public health, safety, and welfare by the possible diminution in value of the developer's property as compared to the hardship imposed on the individual landowners.

" '(7) [t]he recommendations of a permanent or professional planning staff; and

" '(8) the conformance of the requested change to the city's master or comprehensive plan.' " *McPherson*, 274 Kan. at 306.

*Gump Rev. Trust v. City of Wichita*, 35 Kan. App. 2d 501, 131 P.3d 1268 (2006), involved the denial of a conditional use permit for the erection of a telecommunications tower. *Gump* demonstrates the advisory nature of the *Golden* criteria. In *Gump*, the reasonableness of the denial of the permit application was based solely on aesthetic considerations, factors not even mentioned in *Golden*. As stated in *Board of Johnson County Comm'rs*, 263 Kan. at 677, the *Golden* criteria "are suggested factors only [they are advisory in nature]. Other factors may be important in an individual case." See *Gump*, 35 Kan. App. 2d 501, Syl. ¶ 6.

In reviewing the commission's decision, we are not free to make findings of fact independent of those explicitly or implicitly found by the commission. We are limited to determining whether the commission could have reasonably found the facts necessary to justify its decision. See *M.S.W., Inc. v. Marion County Bd. of Zoning Appeals*, 29 Kan. App. 2d 139, 145-46, 24 P.3d 175, *rev. denied* 272 Kan. 1419 (2001). There is a presumption that the planning commission acted reasonably, and the court may not substitute its judgment for that of the administrative body. *Board of Johnson County Comm'rs.*, 263 Kan. at 683.

The Evans argue there were four areas of concern with the expansion of the substation that were not adequately addressed by the City. However, the City is not required to make formal findings concerning the granting of Westar's CUP.

"Although strongly encouraged, a governing body is not required to make formal findings of fact concerning its decisions regulating land use. It is more important that there exists a record of what the governing body considered before making its decision so that the reviewing court is not left in a quandary as to why the decision was made." *Zimmerman v. Board of Wabaunsee County Comm'rs,* 289 Kan. 926, Syl. ¶ 11, 218 P.3d 400 (2009).

*Noise Abatement*

The basis of the Evans' noise complaints evolved from Westar hiring Coffeen Fricke & Associations, Inc. (Coffeen), an acoustics consultation firm in December 2007 to perform an evaluation on the substation and the Evans' house. The Evans hired Veneklasen Associates (Veneklasen), another acoustics firm, to review the Coffeen report. Veneklasen concluded that the noise in the Evans' home was severe and would only increase with expansion. Westar acknowledges there is a "pure tone" typical of transformers and it can be psychologically annoying. The Coffeen report recommended the following options: (1) a barrier wall 17-feet high made of a minimum 6-inch-thick normal weight concrete; and (2) replacing the windows in the Evans' house with higher rated acoustical windows.

The evidence presented to the planning commission and the city commission was that a 17-foot barrier wall would be very expensive and cost over a million dollars to construct. It is undisputed that Westar offered to replace the windows in the Evans' house, but the Evans have not accepted the offer stating they already have double pane windows in their house. It is apparent the planning commission and later the city commission had to balance the competing interests of all the parties in this case and settled on a 9-foot barrier wall. There is reasonable evidence in the record which supports the finding that a 9-foot decorative barrier wall would be sufficient.

*Aesthetics*

It is difficult to understand how the topic of aesthetics could be addressed on appeal. As the district court pointed out, at the October 28, 2008, planning commission meeting, counsel for the Evans argued, "No one is complaining about how the substation looks. Everyone is complaining about the noise levels coming from this substation."

We recognize the industrial appearance of the substation and its location in a residential area. It is clear the city commission did as well and also considered this issue based on comments like that of Commissioner Johnson at the November 19, 2008, meeting, "it is always difficult to put things that might be considered as undesirable in areas of the community." It is also clear the City considered the aesthetics in requiring Westar to construct a 9-foot decorative wall between the Evans' property and the substation.

*Stray Voltage*

The Evans testified they had received high voltage electric shocks in their house and attributed them to the substation. Counsel for the Evans testified that she spoke with an electrical engineer and that any ground current could return back into the house through water pipes and anything else metal. The testimony from Westar indicated that stray voltage can come from two sources, static and electrical faults. Static starts at the 230 KV level and it is pretty common at the 345 KV level, but it does not occur at the 115 KV level. The substation is at the 115 KV level. As far as electrical faults, there is a grid of copper cable in the ground under the substation and that will take any fault from the substation directly into the ground. The commission evidently accepted this evidence.

*Electromagnetic Forces*

An electromagnetic field (EMF) is the invisible lines of force that surround any electrical device. The Evans argue the City failed to take any action to determine whether a public health and safety risk was present concerning EMFs. On the contrary, the commission heard evidence from Westar that in the late 1990's, the gov-

ernment sponsored a 6-year study by the Department of Energy and the National Institute of Health that concluded there was no connection between residential EMFs and cancer. Westar presented evidence that EMF readings in the Evans' home were normal. The Evans did not present any evidence to the contrary.

Given our standard of review and the presumption in favor of the zoning authority, the City's action was not so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large. The City appeared to be well aware of the residential characteristics in this area, but also the increasing electrical consumption in the community with the increased development. The City's decision was reasonable on this point.

The City had substantial information before it involving noise, aesthetics, stray voltage, and EMFs. The district court provided a detailed look at how the City's decision took into consideration many of the *Golden* factors:

"The record clearly shows both Commissions were well aware of the character of the neighborhood. Both the written staff report presented to the Planning Commission and Mr. Kevin Hanlin's oral report to the City Commission pointed out the area was R1, Low Density Residential. The neighbors to the substation addressed each Commission stating their concerns the expansion would have on their homes. Clearly both Commissions were aware of the zoning uses of nearby property all being single family residential thus showing consideration of *Golden* factors number 1 and 2.

"A large part of the discussion at both the Planning Commission level and the City Commission level centered around the extent to which the change would detrimentally affect nearby property. There was significant discussion regarding stray voltage, EMF's, and noise emanating from the substation. The requirement that a wall be built was clearly in direct response to the noise concern. The Planning Commission determined they had no way to address the other issues of EMF's and stray voltage. *Golden* factor number 4 was considered.

"The minutes from the City Commission meeting of November 19, 2008 clearly reveal that four of the five Commissioners considered and recognized the gain to the public versus the hardship on the individual property holders. Each of the Commissioners who spoke referred to the need of more electricity to serve the community. The gain to public versus hardship to neighbors is *Golden* factor number 6.

"Staff recommended granting the conditional use permit. This is *Golden* factor 7."

The City has the right to deny or accept a conditional use permit, and its decision carries the presumption of reasonableness. As was stated by the city commission, this substation has been a part of this area for a very long time. No one wants to have an electrical substation for a neighbor, but the city commission had to balance all the interests involved, including Westar's, the Evans' and other neighbors', and the community as a whole. It is reasonable for the City to plan for the increasing electrical needs of the community and reasonable to make the restrictions it did in granting Westar's CUP. The decision is not so wide of the mark that it lies outside the realm of fair debate.

Next, the Evans argue the expansion of the substation required Westar to bring the entire facility into compliance with the City's zoning codes. Specifically, the Evans contend Westar's expansion of the substation requires it to comply with Section 20-701a of the City's zoning regulations regarding screening.

Portions of the City's zoning regulations are included in the record on appeal. Section 21-101(c) defines nonconforming use as "an existing use of a structure or land which does not comply with the use regulations application to new uses in the zoning district in which it is located." Section 21-401(d) provides: "*Enlargement*: No structure that is devoted in whole or in part to a nonconforming use shall be enlarged or added to in any manner unless such structure and the use thereof shall thereafter conform to the regulations of the district in which it is located."

The City's zoning regulations, Section 6-401, expressly permit electric substations within R1 residential districts upon issuance of a CUP. The district court characterized the substation as a "lawful conforming use" under Section 21-5a of the zoning regulations:

"Where a use exists at the time of the effective date of these regulations and is permitted by these regulations only as an exception in the zoning district in which it is located, such use shall be deemed to be nonconforming use, but shall, without further action, be deemed a lawful conforming use in such zoning district. However, such use shall not expand or enlarge until application is made to and approved by the board of zoning appeals as set out in Article 25."

As a lawful conforming use, the district court held the substation was not subject to the nonconforming uses section of the zoning regulations.

In *Crumbaker v. Hunt Midwest Mining, Inc.*, 275 Kan. 872, 881, 69 P.3d 601 (2003), the Kansas Supreme Court discussed the concept of nonconforming use. The court noted that the concept of nonconforming use developed as a means to avoid confrontation with landowners by permitting landowners to continue their properties' preexisting uses. 275 Kan. at 881. The court also stated: "We have defined such an 'existing' or 'nonconforming use' as 'a lawful use of land or buildings which existed prior to the enactment of a zoning ordinance and which is allowed to continue despite the fact it does not comply with the newly enacted use restrictions.' " 275 Kan. at 881

Under Kansas law, the right to a nonconforming use is to be strictly construed. See *Goodwin v. City of Kansas City*, 244 Kan. 28, 32, 766 P.2d 177 (1988). In addition, most courts place the burden of proving an alleged nonconforming use on the party claiming the nonconforming use. 244 Kan. at 33.

The Evans argue the district court's finding of a legal conforming use is directly contrary to the City's own position that the substation is a legal nonconforming use under Section 21-101(c). Even if we disagree with the district court and hold the substation is a legal nonconforming use as argued by the Evans, Section 20-701(b) is not applicable and the screening requirements are not applicable. As stated in the Evans' reply brief, Section 20-701a states: "*Commercial or industrial use adjacent to a residential zone.* Whenever a commercial or industrial zoned tract adjacent to a residential zoning district is used, screening to protect the residential land from the affect of the commercial use shall be required."

We can address the interpretation of Section 20-701a in a way similar to our standard for statutory review. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009) (interpretation of a statute is a question of law over which this court has unlimited review). Westar's property is zoned R-1 Low Density Residential. Because Westar's property is not a "commercial or industrial zoned tract" under Section 20-701a the screening requirements requested by the Evans do not apply. The Evans do not argue that Westar's property is in violation of any other zoning regulations. Although the district court may not have been correct in its char-

acterization of Westar's property, it properly rejected the Evans' claims of a screening requirement. See *Robbins v. City of Wichita*, 285 Kan. 455, 472, 172 P.3d 1187 (2007) (If a district court reaches the correct result, its decision will be upheld even though it relied upon the wrong ground or assigned erroneous reasons for its decision.). Although it might be more consistent to also require such things as electrical substations to be screened, although possible under the regulation here, it is not required.

The Evans also argue the district court erred in denying their motion to join additional plaintiffs.

Interpretation of a statute is a question of law over which this court has unlimited review. *Unruh*, 289 Kan. at 1193. K.S.A. 12-760(a) provides: "Within 30 days of the final decision of the city or county, any person aggrieved thereby may maintain an action in the district court of the county to determine the reasonableness of such final decision."

The city commission granted Westar's CUP on November 19, 2008. The Evans filed their petition for judicial review on December 16, 2008. It was not until July 13, 2009, that Nathaniel Jones and David and Lupe Villar filed a motion to join as additional plantiffs in district court. As seen above, these proposed additional plaintiffs filed protest petitions and spoke at the planning commission meetings. In their motion, the proposed additional plaintiffs claimed their property would be adversely affected by the CUP, no new or additional issues were raised, and their motion was not intended to alter or delay the court proceedings. In denying the motion, the district court stated K.S.A. 12-760(a) was clear that this was not a criminal case with constitutional concerns, the parties stated they would not be raising any new issues, and there were possible jurisdiction issues if the Evans would settle their case and the other parties were not satisfied with the result.

The Evans argue that K.S.A. 12-760 is silent as to whether a participant in the municipal proceedings may join an appeal filed by another participant to the same proceedings if the former did not file a timely and separate appeal. We answer this question in the negative. The time limitations of K.S.A. 12-760 are apparent. Under K.S.A. 12-712 (repealed 1991), the predecessor to K.S.A.

12-760, the court strictly applied the time limitations. See *Bonanza, Inc. v. McLean,* 242 Kan. 209, 216, 747 P.2d 792 (1987) ("Clearly, more than 30 days had elapsed before the suit was filed. We hold that the trial court correctly ruled that defendant McLean was barred by K.S.A. 12-712 from attacking the validity of the zoning ordinance."); *St. John v. City of Salina,* 9 Kan. App. 2d 636, 684 P.2d 464 (1984) ("The plaintiffs' only remedy was to file for review under 12-712. They did not do so within the thirty-day time limit and now they are barred. The trial court did not err in dismissing plaintiffs' action.").

The additional parties are clearly outside the 30-day time limitation for filing an appeal of the City's decision to grant Westar's CUP. There is no dispute the additional parties are "aggrieved parties" within the context of K.S.A. 12-760(a). However, the statute is clear—there are 30 days in which to file a judicial appeal. Allowing the additional parties to circumvent the 30-day rule in K.S.A. 12-760(a) by bootstrapping onto a properly filed appeal of another aggrieved party cannot be within the legislature's contemplation of the time constraints of the statute.

Affirmed.