NOT DESIGNATED FOR PUBLICATION

No. 126,618

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BRETT OHLSEN,
*Appellant*,

v.

CITY OF SENECA, KANSAS, CITY COUNCIL and THE PLANNING COMMISSION/BOARD OF
ZONING APPEALS OF THE CITY OF SENECA, KANSAS,
*Appellees*.

MEMORANDUM OPINION

Appeal from Nemaha District Court; JOHN L. WEINGART, judge. Submitted without oral argument. Opinion filed August 16, 2024. Affirmed.

*J. Phillip Gragson* and *Kara L. Eisenhut*, of Henson, Hutton, Mudrick, Gragson & Vogelsberg, LLP, of Topeka, for appellant.

*Martin W. Mishler*, of Mishler & Sunderland Law Offices, of Sabetha, for appellees.

Before MALONE, P.J., HURST and COBLE, JJ.

PER CURIAM: The City of Seneca (the City) and the Board of Zoning Appeals of the City of Seneca (the Board) granted a conditional use permit (CUP) to Ag Partners Cooperative, Inc. (APC) after a public hearing. Brett Ohlsen—the owner of neighboring property—sought judicial review of the Board's decision. The district court found he failed to prove the actions of the Board were unreasonable under K.S.A. 12-760. Ohlsen now appeals the district court's decision and argues this court should overturn the Board's granting of the CUP because its decision was unreasonable. But while Ohlsen points to some instances where the Board may not have strictly followed the City's procedural

ordinances, he has not met his considerable burden to show the Board's grant of the CUP was so arbitrary that it was taken without regard to the benefit or harm to the community or was so wide of the mark that its unreasonableness is without debate. We affirm the district court's decision.

FACTUAL AND PROCEDURAL BACKGROUND

In May 2022, APC applied to the City and the Board for a permit "to allow for the operation of a new distribution center" that would receive, store, and repackage various agricultural products, including crop protection products, liquid fertilizers, and seeds on a tract of land then zoned as a "transitional agricultural district." APC also requested to relocate its current "NH3 facilities," already located in Seneca, to the new location. The proposed plan related to distance requirements from residential and commercial properties.

The City's administrator, Tami Haverkamp, acts as the development administrator who oversees zoning issues. In this role, Haverkamp met with APC and discussed concerns and potential solutions for its proposed project before the application progressed to a public hearing. Haverkamp discussed with APC its need for water, conferring with a city engineer on different scenarios for water access; a potential need for vegetative screening of the facility; and traffic safety concerns.

Days after APC filed its CUP application, Haverkamp published a notice in the local newspaper stating the Board intended to hold a public hearing on the application on June 2, 2022. The notice made clear that "[a]ll property owners and residents in the city limits within 200 feet of the property and all property owners and residents outside the city limits within 1000 feet of the property for which the [CUP] [was] being sought" would have the right to be heard. On June 2, however, the Board lacked a quorum, so the public hearing was postponed to June 8, 2022. According to Haverkamp, the date of

postponement was announced at the June 2 meeting, but the City did not publish another public hearing notice in the newspaper about the rescheduling.

At the June 8 public hearing, which unfolded over two-and-a-half hours, the Board heard comments from various people including representatives from APC, members of the public, and city staff. At the conclusion of public comments, multiple representatives from APC answered questions posed by the public, including discussions about various aspects of the new facility, such as the safety of the chemicals used, potential water use, and traffic flow. Ultimately, the Board voted to approve the CUP with three conditions: (1) APC would pay for upgrades to Industrial Drive (the road running alongside the tract at issue); (2) APC was required to submit a vegetative screening plan within 60 days for approval by the Board; and (3) APC would agree to the annexation of the property if they hooked onto the city's sewer system. Although the Board did not issue a written decision, discussions at the meeting were transcribed into written minutes by Haverkamp.

Within weeks of the Board's decision, Ohlsen and Ashley Nordhus—property owners who live within 1,000 feet of the subject property—petitioned for judicial review by the district court, arguing the Board's decision was unreasonable, arbitrary, and capricious because it failed to recognize the health and economic impact of the project. The district court held a bench trial on the petition and took the matter under advisement.

A few months later, the district court issued its decision, finding Ohlsen and Nordhus failed to carry their burden of proof by a preponderance of the evidence to show the Board's decision was arbitrary, capricious, and unreasonable. The district court also concluded the Board properly addressed the relevant factors set out in *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978), and determined the CUP, with its required conditions, was in the best interests of the City.

3

Ohlsen brings this appeal.

## THE BOARD DID NOT ERR BY GRANTING THE CONDITIONAL USE PERMIT

On appeal, Ohlsen contends the district court erroneously concluded he did not meet his burden of proof to demonstrate the unreasonableness of the Board's decision because, first, the procedure taken by the City and the Board failed to conform with the City's zoning ordinances and Kansas common law. Second, Ohlsen argues the Board's decision was "grossly unreasonable" because it did not properly consider the evidence and weigh the equities. These are the only issues presented by the parties and accordingly the only issues proper for our examination.

"[A]ny person aggrieved" by a zoning decision may bring an action "to determine the reasonableness of such final decision" as outlined in Kansas laws related to cities and municipalities. K.S.A. 12-760(a). At the first step of judicial review, the district court reviews the zoning decision for reasonableness. The district court's decision is then appealable to this court, which "must make the same review of the zoning authority's action as did the district court." *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980).

Courts give broad deference to zoning authorities in determining whether to grant zoning amendments or rezoning requests. The scope of this court's review is "limited to determining (a) the lawfulness of the action taken, and (b) the reasonableness of such action," and we must presume the zoning authority acted reasonably. *Combined Investment Co.*, 227 Kan. at 28. When assessing reasonableness, we give no deference to the district court's determination, because "[w]hether [an] action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority." 227 Kan. at 28. Kansas courts have largely applied the "*Golden* factors" when examining the reasonableness of a zoning authority's decision—which we

4

discuss in more detail below. A zoning authority's "[a]ction is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate." 227 Kan. at 28.

Here, Ohlsen does not argue that the Board's actions were unlawful, in that they somehow failed to comply with K.S.A. 12-741 or K.S.A. 12-755 of the Planning, Zoning, and Subdivision Regulations in Cities and Counties Act. See *American Warrior, Inc. v. Board of Finney County Comm'rs*, ___ Kan. ___, 2024 WL 3544081, at *5 (2024) (examining whether the county could delegate issuance of conditional use permits to the local zoning board in compliance with state law); *143rd Street Investors v. Board of Johnson County Comm'rs*, 292 Kan. 690, 707-08, 259 P.3d 644 (2011) (outlining that K.S.A. 12-741[a] and K.S.A. 12-755[a] allow cities and counties to enact and enforce zoning regulations so long as the regulations do not conflict with state zoning statutes). Instead, Ohlsen's argument both before the district court and here focuses solely on the reasonableness of the Board's approval of the CUP under K.S.A. 12-760.

As the landowner, Ohlsen bears the burden of proving unreasonableness by a preponderance of the evidence. *Combined Investment Co.*, 227 Kan. at 28.

*Ohlsen fails to demonstrate how any deviation from the city ordinances rises to the level of unreasonableness.*

Ohlsen first claims the Board's decision was unreasonable because the procedures taken by the City and the Board failed to conform to the City's own zoning ordinances. So, although we are not asked to consider the statutory lawfulness of the Board's decision, we may consider any procedural errors as part of our analysis of the decision's reasonableness. See *Golden*, 224 Kan. at 598-99.

5

Ohlsen maintains the Board failed to adhere to processes required in two primary Articles of the city ordinances—"Article 5: Zoning Districts" and "Article 6: Conditional Use Permits."

First, Ohlsen claims the Board's decision was contrary to the zoning ordinances because the land APC proposes to use is designated as a transitional agriculture district, and under Section 5.07.01 of the zoning ordinances, these districts are "established for the purpose of preserving agricultural resources that are compatible with adjacent urban growth." Section 5.07.01 adds that these districts are "designed to limit urban sprawl." Ohlsen agrees APC's development "would undoubtedly limit urban sprawl," but he argues the project "would have the opposite effect of the other stated purpose of the Ordinance, which is preserving agricultural resources."

But apart from claiming APC's proposal would "have the opposite effect" of preserving agricultural resources, Ohlsen proffers no argument or evidence to support this claim. And as the proponent, Ohlsen bears the burden of designating a record sufficient to present his point and establish his claim. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013); Supreme Court Rule 6.02(a)(4) (2024 Kan. S. Ct. R. at 36). Failing to support a point with pertinent authority or failing to show why a point is sound despite a lack of supporting authority is like failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). Ohlsen neither points to evidence in the record that would establish that APC's permit violated the intent of Article 5 because it would not preserve agricultural resources—which, arguably, a business which produces crop preservation products would do—nor does he support his argument with authority to suggest that such violation of the ordinances requires reversal of the Board's decision.

Additionally, this argument is illogical given the purpose of a CUP, which is to grant a use outside of the currently established zoning. While Article 5 may describe

differences between types of zoning districts, Ohlsen's argument ignores the subsequent section—Article 6—specifically permitting exceptions, or conditional uses, of such zoned areas.

Second, Ohlsen argues Article 5, Section 5.07.07 requires certain uses, such as the "[s]torage and distribution of anhydrous ammonia, fuel, fertilizer, and other chemicals," to be a "minimum of 2,640 feet from any residential, commercial, industrial or public use." He claims the maps provided at the public hearing show "there is more than one residential and/or commercial property within 2,640 feet of the proposed location for the new facility" and alleges the City violated its own ordinances because APC admits it plans to receive, store, and repackage bulk liquid fertilizers, which could include anhydrous ammonia.

The record supports APC's intent to store bulk liquid fertilizers and anhydrous ammonia at their proposed facility. But Ohlsen's argument ignores an amendment to Article 5, Section 5.07.07 enacted before the public hearing. As Ohlsen noted in his recited facts, the City amended this ordinance to specifically remove the 2,640-foot requirement. The amended ordinance now reads: "Storage and distribution of anhydrous ammonia, fuel, fertilizer, and other agricultural chemical shall meet *minimum distance setback requirements as set forth by the Environmental Protection Agency*." (Emphasis added.)

During the bench trial, Haverkamp testified the City's planning commission had a public hearing on the setback matter after reviewing APC's site plan. Haverkamp said the planning commission discussed the radius requirement and decided to make a change for the entire zoning jurisdiction, rather than a single property owner, because the ordinance seemed too extreme. She explained the planning commission wanted to change the radius requirements "to be more consistent with an agency they felt like was better versed in being able to determine appropriate distances."

Despite recognizing this amendment, Ohlsen does not suggest the City improperly amended the ordinance, nor does he claim the amended setback ordinance is somehow illegal. He simply does not address it. Again, Ohlsen has not met his burden of proof. See *In re Adoption of T.M.M.H.*, 307 Kan. at 912; *Friedman*, 296 Kan. at 644.

Third, Ohlsen argues the Board's decision to hold a public hearing, and ultimately grant the CUP, was unreasonable because APC violated requirements in Section 6.03 of the City's zoning ordinances by failing to attach with its application "'[a] plan as to the operation and maintenance of the proposed use . . . .'"

Article 6, Section 6.03 requires the CUP application to include a "drawing or site plan," as well as "material constituting a record essential to an understanding of the proposed use and proposed modifications . . . ." This section also states, "A plan as to the operation and maintenance of the proposed use shall also be submitted."

While Ohlsen may be correct that there is no document in the record titled an "operation and maintenance plan" or that outlines, in a single document, the operations and maintenance of APC's proposed use, he does not explain how the omission renders the Board's decision unreasonable. Although the ordinance requires this plan to be submitted with a CUP application, the ordinance does not further define the contents of such a plan. And aside from suggesting APC failed to provide this plan, Ohlsen provides no guidance on what he believes should have been provided to conform with this section of the ordinance.

While perhaps minimal, the record shows APC did provide some relevant plans for maintenance and operations in its application, including a chart that detailed various standards for compressed gas, and then identified that "[c]ontainer storage areas shall be accessible to emergency vehicles and personnel," as well as noting that "[a]reas within 10 ft (3 m) of a storage container shall be maintained clear of dry grass and weeds and other

8

combustible materials." And unlike Section 6.03, the CUP application itself did not require the applicant to submit a separate "operation and maintenance" plan; rather, it simply required a sketch which included a description, boundary lines for the property, the location of existing structures, drive and improvements on the subject property, and any affected adjacent properties. We have no argument before us that APC failed to adhere to these requirements within the application itself.

Given the differing requirements set out by the application form and Article 6, Section 6.03, along with the plans that were included with the application, we cannot say Ohlsen has shown approval of the application was arbitrary or so "wide of the mark" that it is patently unreasonable. *Combined Investment Co.*, 227 Kan. at 28.

In his fourth argument related to city ordinances, Ohlsen contends the Board failed to make findings of fact for its decision, thereby violating Section 6.05. This section requires that "[a]ll decisions by the Board of Zoning Appeals shall . . . provide findings of fact for their decision for either approval or denial." Ohlsen also argues the Kansas Supreme Court requires the Board to summarize the evidence before stating the factors leading to its decision. See *Golden*, 224 Kan. at 597 ("A board . . . granting a specific zoning change, should enter a written order, summarizing the evidence before it and stating the factors which it considered in arriving at its determination.").

But as the City argues, other panels of this court have found formal written findings of fact or orders are not strictly required, despite being "'strongly encouraged.'" *Evans v. City of Emporia*, 44 Kan. App. 2d 1066, 1071, 243 P.3d 374 (2010) (quoting *Zimmerman v. Board of Wabaunsee County Comm'rs,* 289 Kan. 926, Syl. ¶ 11, 218 P.3d 400 [2009]). In *Zimmerman*, the Kansas Supreme Court reasoned:

> "Although strongly encouraged, a governing body is not required to make formal findings of fact concerning its decisions regulating land use. It is more important that

9

there exists a record of what the governing body considered before making its decision so that the reviewing court is not left in a quandary as to why the decision was made." 289 Kan. 926, Syl. ¶ 11.

And in *Evans*, the court relied on *Zimmerman* to deny the appellant's contention that the zoning board did not adequately address concerns: "The Evans argue there were four areas of concern with the expansion of the substation that were not adequately addressed by the City. However, the City is not required to make formal findings concerning the granting of Westar's CUP." *Evans*, 44 Kan. App. 2d at 1071.

To the extent Ohlsen argues the Board's action was a violation Section 6.05, his argument is likewise unpersuasive. Although this section requires "findings of fact," the ordinance does not require these findings be written, and our prior caselaw does not support the imposition of such a strict requirement. As discussed in *Zimmerman*, of primary importance is our ability to view a record of what the governing body considered in making its decision. We are left in no such quandary here, as we have six single-spaced pages of minutes, detailing each speaker during the public hearing and the topics discussed by each, including the concerns of each of the four voting Board members. We find Ohlsen has not met his burden to show the findings outlined in the minutes were demonstrably unreasonable.

Ohlsen's remaining procedural arguments involve allegations that the Board violated 6 of the 11 standards for CUP approval set out in Article 6, Section 6.08. This ordinance states, in pertinent part:

"No conditional use permit shall be granted unless the Board of Zoning Appeals has found:
"1. The establishment, maintenance, or operation of the conditional use will not be detrimental to or endanger the public health, safety, moral, comfort, or general welfare of the community.

10

"2.  The conditional use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purpose already permitted, nor substantially diminish and impair property values within the neighborhood.

. . . .

"5.  Adequate measures have been or will be taken to provide ingress and egress so designed as to minimized traffic congestion in the public streets.

. . . .

"7.  The use shall not involve any pollution of the air by fly-ash, dust, vapors or other substance which is harmful to health, animals, vegetation or other property or which can cause soiling, discomfort, or irritation.

"8.  The use shall not involve any malodorous gas or matter, which is discernible on any adjoining lot or property.

. . . .

"10.  The use shall not involve any activity substantially increasing the movement of traffic on public streets unless procedures are instituted to limit traffic hazards and congestion."

Under the first standard, Ohlsen renews his argument that the City did not require a plan for the operation and maintenance of the new facility. He contends that without this documentation, the Board lacked the information it needed to make proper findings on this standard, so its uninformed decision to grant the CUP was unreasonable. For the reasons discussed above, we find Ohlsen's argument unpersuasive.

And, under the second standard, Ohlsen argues that he and multiple other residents at the meeting told the City how the facility would injure the use and enjoyment of their properties or diminish their property values. He and other citizens expressed safety concerns for livestock, smell, water supply and pressure, dust, and aesthetics. According to Ohlsen, only APC's Vice President of Asset Management, Brian Winkler, believed the facility would not influence property values. In the meeting minutes, Winkler stated "his own house is within 300 [feet] of [the current APC] NH3 storage [facility] and that when

he bought it, he actually had a bit of a bidding war to get it, so he doesn't believe this will negatively affect property values."

But Ohlsen's arguments improperly suggest we reweigh statements presented at the hearing. Citing Kansas law that recognized landowners are competent witnesses to testify on the value of their property and pointing to local landowners who disagreed with Winkler's opinion, Ohlsen suggests we ignore Winkler's assessment due to bias—that is, Winkler's corporate motivation to support approval of the CUP. See *City of Wichita v. Sealpak Co.*, 279 Kan. 799, 802, 112 P.3d 125 (2005) ("It is well settled that a landowner is a competent witness to testify as to the value of his or her property."). But weighing credibility and deciding facts is the position of the Board—and this court has no authority to undertake these tasks.

Under the 5th and 10th standards of Section 6.08, Ohlsen argues the City failed to address the traffic concerns raised by citizens. Although the issues were discussed, he contends the Board did not remedy the concerns and ignored them. But contrary to his interpretation, the meeting minutes show the Board did consider traffic concerns and simply decided the benefits of expansion outweighed the costs. Though many residents commented on traffic issues, Winkler responded by discussing his communications with the Kansas Department of Transportation (KDOT). The Board members spoke about traffic concerns and responded by requiring improvements to Industrial Drive as a condition of approval. Although Ohlsen does not agree with the Board's conclusion that the traffic issues were adequately handled, given our presumption of the Board's reasonableness and this court's inability to determine facts independent of those found by the Board, Ohlsen's argument under these standards is unpersuasive.

Addressing the seventh standard under Section 6.08, Ohlsen argues multiple citizens expressed concerns regarding dust, which was not addressed by the Board as a condition of the CUP. But his brief argument is not persuasive, as he does not explain

how the City's failure to impose dust conditions violated this standard, which is aimed at preventing air pollution. The record contains no evidence of the level of dust either produced by APC's proposed facility or what a "safe" level of dust might be. And, according to the minutes, APC was already mitigating the dust issue at the time of the public hearing: "Kevin Berman, [APC] Regional Direction for . . . this area, . . . stated they just spent $4600 for dust control at their current facility this past week because they want to keep the dust down too." Because Ohlsen does not support his argument with any evidence, we presume the consideration by the Board was reasonable.

Finally, under the eighth standard of Section 6.08, Ohlsen briefly argues the Board failed to consider concerns regarding the smell that would come from the new facility. But again, Ohlsen offers no evidence the new facility would "involve any malodorous gas or matter, which is discernible on any adjoining lot or property"—and this is his burden. See *Friedman*, 296 Kan. at 644; Supreme Court Rule 6.02(a)(4). Instead, Ohlsen simply argues his point without pointing to a part of the record that establishes either his claim that the dust would be harmful or that the involvement of malodorous gas is discernible for any adjoining property. Cutting against his assertions is the discussion demonstrated in the minutes, where Safety Director for APC, Curtis Stahel, outlined statistics for APC's prior year, showing no incidents aside from small vapor leaks due to temperature variations.

In sum, we find Ohlsen's arguments related to the Board's compliance with its city ordinances unpersuasive. Although we may consider any procedural errors as part of our reasonableness analysis, Ohlsen failed to prove, in some instances, that any error occurred, and in all scenarios, how any such error would cause the Board's decision to rise to the level of arbitrariness. We continue, then, to examine the reasonableness of the decision.

*The Board's decision was reasonable under the* Golden *considerations.*

As Ohlsen correctly argues, the Kansas Supreme Court has found that zoning authorities should largely consider eight factors when deciding whether to approve a proposed zoning requirement:

> "(1) The character of the neighborhood;
>
> "(2) the zoning and uses of properties nearby;
>
> "(3) the suitability of the subject property for the uses to which it has been restricted;
>
> "(4) the extent to which removal of the restrictions will detrimentally affect nearby property;
>
> "(5) the length of time the subject property has remained vacant as zoned; and
>
> "(6) the relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property as compared to the hardship imposed upon the individual landowner[;]
>
> "[(7)] the recommendations of permanent or professional staff[;] and
>
> "[(8)] the conformance of the requested change to the adopted or recognized master plan being utilized by the city." *Golden*, 224 Kan. at 598.

Kansas appellate courts have reaffirmed these *Golden* factors, and "other relevant factors," when evaluating the reasonableness of a zoning authority's decision. See, e.g., *143rd Street Investors*, 292 Kan. 690, Syl. ¶ 3 ("Zoning authorities should consider the nonexclusive factors established in [*Golden*], other relevant factors, and the zoning authority's own comprehensive plan when acting on an application for rezoning."); *Zimmerman*, 289 Kan. at 945-46; *Manly v. City of Shawnee*, 287 Kan. 63, Syl. ¶ 5, 194 P.3d 1 (2008) ("When considering zoning matters, a governing body should consider the factors set forth in [*Golden*]."); *McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, Syl. ¶ 3, 49 P.3d 522 (2002).

In *Zimmerman*, the Kansas Supreme Court interpreted *Golden* to conclude judicial review of zoning determinations is "highly deferential" to the zoning board based on *Golden*'s sixth factor:

> "Rule (6): 'Action is unreasonable when it is so *arbitrary* that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness *lies outside the realm of fair debate*.'" *Zimmerman*, 289 Kan. at 948 (quoting *Combined Investment Co.*, 227 Kan. at 28).

As previously noted, the *Golden* court also advised zoning authorities to "place in their minutes a written order summarizing the evidence and stating the factors which were considered in reaching the decision either to deny or grant a requested zoning change." 224 Kan. 591, Syl. ¶ 4. This is because "[a] mere yes or no vote upon a motion to grant or deny leaves a reviewing court, be it trial or appellate, in a quandary as to why or on what basis the board took its action." 224 Kan. at 597. And while reasonableness remains the standard, that reasonableness is "more readily, more effectively, and more uniformly applied if zoning bodies will place in their minutes a written order delineating the evidence and the factors the board considered in arriving at its conclusion." 224 Kan. at 599.

But even so, later courts held the *Golden* factors are not mandatory. The *Zimmerman* court helpfully explained such factors may not be helpful in cases, such as this, granting CUPs:

> "Indeed, we have held the *Golden* factors are nonmandatory, even in cases that are clearly quasi-judicial. As we stated in *Board of Johnson County Comm'rs* [*v. City of Olathe*], 263 Kan. [667,] 677, 952 P.2d 1302 [(1998)]: 'These are suggested factors only. Other factors may be important in an individual case.' See also *Landau*, 244 Kan. at 262 (*Golden* factors are suggestions). We observe that even when concerning a conditional

use permit on a single tract of land, *i.e.*, clearly a quasi-judicial action, the Court of Appeals has essentially examined only aesthetics as a factor. See *Gump Rev. Trust v. City of Wichita*, 35 Kan. App. 2d 501, Syl. ¶¶ 3, 5, 131 P.3d 1268 (2006). Aesthetics obviously is not even a *Golden* factor; at least in the 'individual case' of *Gump*, aesthetics was therefore regarded as 'more important' than *Golden*'s factors. *Gump*, 35 Kan. App. 2d at 509-12; see *Board of Johnson County Comm'rs*, 263 Kan. at 677." *Zimmerman*, 289 Kan. at 950-51.

As discussed, here the Board did not issue a written order summarizing the evidence and specifying which *Golden* factors it considered when it granted APC's application. But even if the Board did not strictly apply the *Golden* factors, our standard of review requires Ohlsen to show the Board's decision to grant the CUP was unreasonable because "it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate." *Combined Investment Co.*, 227 Kan. at 28. And, as we have noted above, the minutes of the Board's public meeting involve considerably more information on the Board's decision than a simple "yes or no" vote.

Neither party benefits this court with detailed arguments on reasonableness. Most of Ohlsen's argument challenges the Board's procedure, then complains that the Board failed to apply, and articulate in a written order, which *Golden* factors it considered. Ohlsen primarily argues the Board "failed to weigh the evidence that the Ordinances require them to weigh" and it did not attempt to balance the various equities presented by citizens at the hearing. Briefly outlining the *Golden* factors, Ohlsen claims the Board did not consider the zoning and uses of the properties nearby, it did not consider the economic use of the property under the existing zoning, and it did not consider the length of time the property had not been vacant as zoned: "This level of disregard for the law and the concerns of the city's residents is grossly unreasonable."

16

In response, the City simply argues the *Golden* factors are not determinative, and even if they were, by his own admission, Ohlsen acknowledged in his district court trial testimony that sufficient evidence was presented at the public hearing to address the *Golden* factors—a claim Ohlsen denies.

On our review of Ohlsen's trial testimony, we are not so sure he admitted to facts contrary to his argument on appeal, but we also find it unnecessary to scrutinize his testimony to decide as much. Regardless, Ohlsen has still not shown the Board's decision was unreasonable.

As noted, Ohlsen argues the Board's action was unreasonable because it did not adequately address multiple issues raised by citizens. But despite the Board's failure to comply with *Golden*'s suggestion on written findings, the minutes of the public meeting shows the Board listened to the citizens' concerns, which were largely addressed by APC employees and officers, before making its decision to grant the CUP.

Ohlsen points to a few *Golden* factors, seemingly to suggest those factors should weigh against granting the CUP. As he argues, APC's application admitted the property "is currently farmland, which is the intended purpose for which it is currently zoned." Based on this, he argues that "[t]he fact [the property] is currently being used for its intended purpose was never even discussed at the public hearing, let alone considered as it should have been."

But if Ohlsen wanted the Board to consider this factor, he should have raised this issue at the hearing, yet he did not. And his reliance on this factor seems misguided. Of course, the CUP is not what the original zoning intended—the permit seeks a conditional use, which by definition is different than the assigned zoning. And Ohlsen does not explain why this factor should have been considered, and then weighed against, the granting of the CUP. He simply argues the Board was unreasonable for not doing so,

which is not persuasive. See *In re Adoption of T.M.M.H.*, 307 Kan. at 912; *Friedman*, 296 Kan. at 644. And, contrary to his argument, one Board member seems to have considered that, although agricultural use was the original zoning of the land, APC's proposal would likewise advance agriculture, which is the "lifeblood" of the area and "brings in people and families and benefits the community as a whole."

Similarly, Ohlsen complains the Board did not consider the length of time the subject property had remained occupied. True, APC admitted the property was not vacant at the time of their application. But again, Ohlsen does not explain why he failed to raise this issue to the Board, or why it was unreasonable for the Board not to consider it. See *In re Adoption of T.M.M.H.*, 307 Kan. at 912; *Friedman*, 296 Kan. at 644. As repeatedly noted, zoning boards are not required to consider the *Golden* factors, and some may not always be applicable to certain types of zoning issues. See *Zimmerman*, 289 Kan. at 950-51.

In his final argument for unreasonableness, Ohlsen generally claims the Board failed to weigh the citizens' "concerns about the public health, safety, and welfare." Ohlsen says he "can find no section in the minutes from the June 8, 2022, public hearing that compare[s] these 'gains' to the hardship that they will impose on any of its residents, whether in attendance at the meeting or not."

But our review of the minutes concludes otherwise. According to the record, which included details down to the time each person made his or her comments, the public hearing began with the Board hearing nearly 45 minutes of citizen concerns. At the conclusion of public comments, various representatives from APC addressed many of the issues raised during the public comments and entertained questions. Stahel, who acts as the Safety Director for APC, specifically addressed safety, like the presence of anhydrous ammonia gas, water and gas setback requirements, and general regulations. He

18

also stated that transportation, not the facility or property itself "is [the] most likely situation for accident or injury."

Kevin Bergman, a regional director for APC, then addressed concerns regarding water use, traffic, and dust mitigation. According to Bergman, APC had a plan for traffic related to water trucks, as well as a plan for capturing storm surge water. Bergman also said APC had already began mitigating for dust.

Winkler also addressed traffic concerns. He said APC was in contact with the KDOT and a KDOT supervisor determined no turn lanes were required on the adjacent highway because there was not currently enough traffic to support the need. Winkler also stated that "the long-term plan for the city showed the proposed site within an area designated for industrial use." And again, in response to economic concerns about neighboring property values, Winkler noted he entered a bidding war to purchase his own home that was currently within 300 feet of the local NH3 storage, "so he doesn't believe this will negatively affect property values."

A few citizens had more questions in response to the comments by APC's employees, and it appears from the minutes that APC responded to each of the comments. For example, Wes Spohr, the president and chief executive officer of APC, said the new location would have 25-30 employees, in direct response to a question from the public. And when Ohlsen asked what might eventually happen to the east of the new facility, one Board member stated that "the Seneca West Master Plan showed the area intended for industrial use," and another Board member responded, "Industrial Drive was called Industrial Drive for a reason."

At the conclusion of the public comment period, the minutes show the Board considered the salient issues before reaching a conclusion. "Bruce Hermesch [a Board member] stated he has wrestled with all the questions but supports the project." Notably,

Hermesch "stated agriculture is the lifeblood of the area" and determined the traffic concern was something that could be managed. Important here, Hermesch "concluded by stating you don't choke business expansion because you don't want to deal with traffic."

Another Board member, Galen Niehues, started by stating "traffic is a big concern anywhere and that the McDonald's corner is bad now too." And after asking Haverkamp about utility issues, Niehues "summarized that [the] main concerns that he has heard are safety and property values." But despite these concerns, Niehues said he was on "the planning commission in 1994 when a plan was formed to address future growth," and believed "the proposed use allows for conformity because it fits within the Seneca West Master Plan, which showed the area as industrial use." After discussions with the city attorney regarding including conditions in the permit, Niehues stated that he "wanted no hasty decisions and noted possible conditions could be Industrial Drive improvements, screening, and annexation."

Through the public comment, citizens expressed concerns regarding the visibility of APC's operations and how vegetation could be used to "screen" the business from public view. Board member Jim Reitz suggested adding trees to provide screening. Ultimately, Hermesch moved to approve the CUP with three conditions: (1) APC "pays for the upgrade of Industrial Drive"; (2) that "[APC], [the] Ohlsens, and the [Board] come to an agreement on [vegetation] screening"; and (3) that APC "agrees to the annexation of the property if they hook onto the city's sewer system." The motion was seconded, but Haverkamp stated she had concerns about the second condition because it would leave open further negotiations amongst private parties. Haverkamp stated the Board "has the final decision on the matter and suggested they decide what they wanted to see for vegetative screening."

After this, "[p]ossible distances between trees was discussed, as was garnering help from the K-State extension service." And Hermesch amended his original motion to

change the second condition to read: "2) The applicant be required to submit a vegetative screening plan within 60 days for approval by [the Board]." The amended motion was seconded, discussion ceased, and the Board voted. Four members voted to grant the CUP, including Niehues, and two abstained due to their current or prior employment by APC.

Again, we must presume the zoning authority acted reasonably based on the facts presented to it. *Combined Investment Co.*, 227 Kan. at 28. We may find the Board's action unreasonable only "when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large" and "was so wide of the mark that its unreasonableness lies outside the realm of fair debate." 227 Kan. at 28.

This is a high standard to reach, and Ohlsen has simply failed to convince us of this level of arbitrariness in the Board's decision. A review of the minutes shows the Board considered both the citizens' and APC's views of the issues raised at the hearing. Despite a lack of written findings, the minutes show members of the Board considered the concerns of the public against the gains of approving the CUP. Based on the information provided at the hearing, it was not clearly unreasonable for the Board to grant the CUP when there was no evidence—but solely argument—presented to the Board to support citizens' concerns of safety, traffic, and property values. While Ohlsen may not like, or agree, with the information APC's representatives presented during the public hearing, APC's responses to the public's concerns cut against Ohlsen's arguments, and he provides no evidence to the contrary. Ohlsen has not shown the Board's action of granting the CUP rose to the level of being so arbitrary that it was taken without regard to the community's concerns and its unreasonableness is without debate. See 227 Kan. at 28.

Affirmed.

21